900 A.2d 753

**CHARLES COUNTY COMMISSIONERS, et al.**

v.

**Anne Marie JOHNSON, et al.**

**No. 104, Sept. Term, 2005.**

Court of Appeals of Maryland.

June 9, 2006.

John F. Breads, Jr., Columbia (Betty Stemley Sconion, Asst. Atty. Gen., Pikesville, on brief), for petitioners.

Douglas Desjardins (R. Jack Clapp & Associates Co., L.P.A., Washington, DC, on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We granted (390 Md. 284, 888 A.2d 341 (2005)) the Petition for Writ of Certiorari filed by the Board of County Commissioners for Charles County, Maryland (denominated as the Charles County Commissioners below and elsewhere in this opinion), the Office of the Sheriff of Charles County, and the State of Maryland ("Petitioners"), to consider whether the Court of Special Appeals erred when it vacated summary judgment granted to Petitioners on a complaint brought against them in the Circuit Court for Charles County by Anne Marie Johnson and Jolene Johnson, Respondents, alleging causes of action under §§ 19–101 and 102 of the Transportation Article of the Maryland Code.[1] The intermediate appellate

1. At the time of the events described in the complaint, § 19–101 of the Transportation Article provided, in pertinent part:

§ **19–101. Liability for negligence of police officer.**

(a) *Liability for damages and injuries.*—If any police officer of this State or any political subdivision of this State, while otherwise acting within the scope of his authority in enforcing any law, directs the driver of any motor vehicle, other than a police vehicle, to assist him in enforcing that law or in apprehending any person suspected of violating or known to have violated that law, this State or the political subdivision, as the case may be, is liable for the damages or injuries proximately caused by the negligence of the police officer.

Maryland Code (1977, 1999 Repl.Vol.), Transportation Article, § 19–101. Unless otherwise stated, all references to the Maryland Code refer to sections of the Transportation Article.

At the time of the events described, § 19–102 provided, in relevant part:

§ **19–102. Liability for commandeered vehicles used in a roadblock.**

(a) *Directing participation in roadblock prohibited.*—A police officer may not direct any driver, owner, or passenger of a motor vehicle, other than a police vehicle, to participate in a roadblock.

(b) *Liability for damages and injuries.*—If any police officer of this State or any political subdivision of this State, while otherwise acting within the scope of his authority in enforcing any law, directs the driver, owner, or passenger of a motor vehicle other than a police vehicle to participate in a roadblock to assist him in enforcing that law or in apprehending any person suspected of violating or known to have violated that law, this State or the political subdivision, as the case may be, is liable for the damages or injuries proximately caused by participation in the roadblock.

Maryland Code (1977, 1999 Repl.Vol.), Transportation Article, § 19–102.

court concluded that, under the totality of the factual circumstances reflected in the pleadings, discovery responses, and reasonable inferences able to be drawn therefrom in a light most favorable to the non-moving party (Respondents here, who were plaintiffs in the trial court), there existed material factual disputes sufficient to require a jury determination of whether a police officer or officers "directed" decedent civilian, Joseph Johnson (Respondent Anne Marie Johnson's husband and Respondent Jolene Johnson's father), to assist in the apprehension of a fleeing suspect and/or "directed" him to participate in a roadblock for that purpose in the course of which he was injured and ultimately died.

## I.

The prefatory facts leading to the denouement at the intersection of Route 301 and Smallwood Drive are undisputed. At approximately 8:54 a.m. on the morning of 25 August 1999, Corporal Wayne Boarman of the Maryland Transportation Authority Police observed, from his post at the Governor Harry Nice Bridge on the Maryland side of the Potomac River at its border with Virginia, a green Chevrolet sports utility vehicle ("SUV") traveling northbound in the southbound lanes of Interstate Route 301 at a speed of approximately 60 miles per hour. Corporal Boarman noted that as the SUV passed in the wrong direction through the southbound-only toll plaza, it swayed as it proceeded between the concrete toll abutments, accelerating at a high rate of speed after it did so. The SUV continued traveling northbound on Route 301 in the southbound lanes. Corporal Boarman immediately used his radio to contact Officer Lawrence M. Collins, a Maryland Transportation Authority Patrol Officer, to watch for the green SUV, traveling northbound in the southbound lanes.

At 9:02 a.m., Corporal Boarman also contacted by radio the Charles County Sheriff's Office to advise that a "dark green Blazer," driven by a white male, passed through "the tolls at approximately 100 miles per hour," and "was going northbound in the southbound lanes of Route 301." Three minutes

later, the Charles County Sheriff's Office Communications Officer for District 1 broadcasted a lookout.

Shortly after the lookout broadcasted, several Deputy Sheriffs, who heard the radio lookout for the green SUV, observed the vehicle driving northbound in the southbound lanes on Route 301 at speeds ranging from 60 to 100 miles per hour, using the shoulder and grass median to pass other vehicles in its path. Corporal Donald Belfield, Corporal Joseph Gibson, and an Officer Burroughs all activated emergency equipment in their respective marked cruisers and engaged in pursuit of the vehicle. Due to the high rate of speed of the SUV, however, they were unable to overtake it. Corporal Belfield and Officer Burroughs abandoned their pursuit. Corporal Gibson continued the chase.

Corporal Gibson observed the SUV pass through a red traffic signal at the intersection of Route 301 and Billingsley Road/Route 225 at a speed in excess of 90 miles per hour. He passed along that observation over his radio. Just prior to the vehicle passing through the intersection, Sergeant Daniel Gilmer of the Charles County Sheriff's Office broadcast that he would attempt to halt the vehicle using stop sticks.[2] This attempt failed. Sergeant Gilmer notified at 9:07 a.m. all units listening of the failed attempt and canceled the participation of all LaPlata-based units, with the exception of Corporal Gibson, who was now approximately 900 to 1200 feet behind the speeding SUV.

The SUV was now traveling between 75 and 100 miles per hour. It continued using the grass median to swerve past

---

2. A stop stick is a tire-deflation device used by law enforcement officers to aid in terminating high-speed pursuit chases. The device utilizes multi-dimensional spikes that, upon deployment, deflate a tire, bringing it to a slow stop, without causing a blow-out or scattering debris on the roadway. The stick, which fits easily into the trunk of a standard police cruiser, has a long cord attached to one end of the stick. The stop stick is deployed by holding the stick portion in one hand and, while holding the cord in the other hand, tossing the stick across the roadway and pulling the cord slightly to move the stick into position. When the automobile crosses over the spike-laden stick, the spikes puncture the tires and theoretically the automobile slows to a stop.

traffic on Route 301. At 9:10 a.m., Corporal Gibson inquired over the police radio if "stop sticks" were available in Waldorf. The dispatcher advised him that the State Police would attempt to deploy stop sticks at the intersection of Route 301 and Smallwood Drive, an entrance to the St. Charles community in Waldorf, Maryland, approximately 1.25 miles north of the intersection of Route 301 and Billingsley Road/Route 225.

Sergeant Michael McGuigan of the Charles County Sheriff's Office initially was located at the District III Station in Waldorf when he heard radio calls about the high speed chase of a vehicle traveling northbound on Route 301. Knowing that he had stop sticks in the trunk of his marked police vehicle, he activated the emergency equipment of his vehicle and proceeded westbound on Smallwood Drive towards its intersection with Route 301. As he reached the intersection, he noticed that the light controlling traffic westbound on Smallwood Drive turned from red to green. At 9:10 a.m., as he entered the intersection, he asked the dispatcher in what lanes of traffic on Route 301 the suspect's vehicle was approaching. Eight seconds later, the dispatcher advised that the suspect's vehicle was "passing Billingsley [Road] at this time." Twenty seconds later, Sergeant McGuigan asked, "Is it northbound or southbound coming into Waldorf?" One second passed before the dispatcher responded, "That's correct. It's coming into Waldorf." Unsure of in which lane of traffic the suspect was traveling, Sergeant McGuigan later would explain that he positioned his marked police vehicle, emergency lights still flashing, in the center of the intersection, past all northbound lanes, stopping close to the turn lanes from southbound Route 301. By doing so, he prevented traffic from eastbound Smallwood Drive from entering the intersection. Just after he so positioned his vehicle, an unmarked burgundy State Police vehicle (operated by Maryland State Trooper First Class Thomas Ford) entered the intersection from southbound Route 301 and pulled up next to him.

At 9:11 a.m., twenty seconds after transmitting the last previous radio messages, the dispatcher advised Sergeant McGuigan that the suspect's vehicle now was traveling in the

grass median of Route 301. Looking south toward the oncoming northbound lanes, the Sergeant saw the emergency lights of a police car in the distance. He then focused on the scene immediately around him, noting that approximately 10 cars in the five lanes of northbound Route 301 were stopped at the red traffic light. Sergeant McGuigan got out his car, ran to the trunk, and grabbed the stop sticks. He ran with them towards the northbound lanes of Route 301. Looking south, he saw the oncoming suspect vehicle approaching at a high rate of speed. He guessed that the suspect would either turn onto eastbound Smallwood Drive or proceed north by using the unobstructed right shoulder, across the northbound lanes of Route 301. Intending to deploy his stop sticks there, he continued to run towards the shoulder of Route 301.

Contemporaneously with Sergeant McGuigan's activities, Private First Class William Donley and Probationary Officer Donald Raby entered the intersection, each in their marked police cruisers. Officer Donley noticed that cars in the northbound lane of Route 301 were stopping at the red traffic light. He also noticed Sergeant McGuigan's vehicle, with emergency equipment activated, proceed to the center of the intersection. Officer Donley later would attest that he directed Officer Raby to activate the emergency equipment on his vehicle and position his cruiser in front of, and perpendicular to, traffic on westbound Smallwood Drive in order to prevent that traffic, which now had a green signal, from entering the intersection with Route 301. Officer Donley did likewise with his vehicle. Shortly thereafter, Officer Donley looked south on Route 301 and observed the suspect's vehicle traveling north at an extremely high rate of speed, dodging other northbound cars as they slowed in apparent anticipation of arriving at the Route 301/Smallwood Drive intersection.

At about that time, Trooper Ford reached the intersection of Route 301 and Smallwood Drive in his unmarked cruiser. He observed two Sheriff's Office vehicles, with emergency lights activated, in or near the intersection. He later would state that he positioned his vehicle adjacent to Sergeant McGuigan's vehicle. Trooper Ford also represented that he

did not believe that either vehicle was positioned near, or impeded traffic from, the northbound lanes of Route 301. After asking Sergeant McGuigan about the suspect's location, Trooper Ford also sought out stop sticks from his cruiser. As he did so, he saw the suspect's vehicle imminently in the northbound lanes of Route 301 at the intersection.

As Corporal Gibson, while following in pursuit of the suspect, approached the intersection of Route 301 and Smallwood Drive, he saw police activity that appeared to him to be an effort to clear the intersection of traffic. He noticed that the right shoulder of northbound Route 301 was unobstructed. He was now approximately 1500 to 1800 feet behind the suspect's vehicle, which repeatedly changed lanes and rocked back and forth as it closed on the intersection. Gibson noticed that the traffic light for northbound traffic was red. He watched the SUV enter the far right lane next to the shoulder and collide with the stopped civilian cars.

The SUV became airborne. It passed directly over Sergeant McGuigan's head, landing in the center of the intersection, on the northbound side. Because the right shoulder had been clear of traffic, Corporal Gibson concluded that the suspect purposely rammed the stopped cars. Immediately after the collision, Sergeant McGuigan ran to the vehicles struck by the suspect's SUV and asked the occupants to stay in their cars until help arrived. Several officers advised the police radio dispatcher of the collision and requested emergency medical units. Trooper Ford ran to the car occupied by Joseph Johnson, which had been struck by the suspect. Trooper Ford attempted to comfort the driver, called for medical assistance, and then ran to assist other officers who were attempting to secure the suspect. The collision caused severe injuries to Mr. Johnson.[3]

Captain Joseph Montiminy, the Commander of the Patrol Division of the Sheriff's Office, arrived later at the scene of

---

**3.** Mr. Johnson lapsed into a coma, from which he never recovered. He died 18 months later.

the collision. Although he played no part in the chase, he learned of its details through questioning the various officers involved. Later that day, he conducted a "Critical Incident Critique" with most of the officers involved. Based on information gleaned from that meeting, Captain Montminy determined that no "roadblock," "barricade," or "blockade" had been conceived or used on Route 301 at the Route 301/Smallwood Drive intersection in an attempt to halt the suspect's vehicle. In contrast to the conclusions of Captain Montiminy, Corporal Boarman wrote later that day in a report:

> AND AN ATTEMPT TO STOP THE VEHICLE WAS MADE AT THE INTERSECTION OF U.S. RT. 301 AND SMALLWOOD DRIVE IN WALDORF; MD, BY BLOCKING THE INTERSECTION IN AN ATTEMPT TO FORCE THE VEHICLE INTO THE RIGHT TURN LANE. THE VEHICLE ATTEMPTED TO PLOW THROUGH THE ROADBLOCK WHICH RESULTED IN A NEAR FATAL TRAFFIC ACCIDENT AND THE APPREHENSION OF THE SUBJECT.

Gloria Colburn, a civilian, was a driver of one of the cars that approached on Route 301 northbound at the intersection of Route 301 and Smallwood Avenue. She stopped her car in the far right lane of northbound Route 301 as police were pulling into the intersection. At the same time that she noticed the police activity in the intersection, she noticed that the traffic light facing her northbound direction of travel was green. She testified to the following at her deposition in this case:

A Okay. I was driving on Route 301 going north and a little—a distance away I saw the light was green and—but then at the same time I noticed that there were some police cars under the intersection. So I was aware of—I knew I was going to be stopping because they were more or less right—they were right across the road, and I knew I'd stop whether the light was green or red, but by the time I got to the light, the light had changed to red.

Q Okay. And then what happened?

A I was correct. There were three police cars across the intersection of the road, and I just sat there, and they were sitting also in their car.

And I waited and waited because I thought they would direct me on what to do, but they seemed very calm sitting in the car, so I just sat there and was curious as to why we were there.

And I kind of assumed at that time maybe we were waiting for a funeral to pass or something of that nature because nothing seemed out of order.

. . . .

Ms. Colburn also stated, making use of a visual aid in an attempt to demonstrate the positions of the various vehicles, that three police cars were parked in the intersection in such a way as to make it physically impossible to move her vehicle, there being "no opening."

John Weyrich, another civilian driver who was positioned in the far right northbound lane of Route 301 at the intersection, testified that three police vehicles were parked at the intersection, two with their emergency lights flashing.[4] Corporal Belfield, in his deposition, stated that he interviewed a witness, Mr. Sadaka, another motorist stopped at the intersection. Mr. Sadaka told Corporal Belfield that police officers had stopped traffic from crossing Route 301 prior to the collision.

On 23 August 2000, Anne Marie Johnson, individually and as proposed guardian for her injured, but still living, husband, Joseph Johnson, filed the present action in the Circuit Court for Charles County.[5] The Complaint named David Glenn

---

4. Mr. Weyrich testified to these events during the criminal/motor vehicle trial of David Glenn Hicks, the driver of the SUV. Mr. Weyrich died before he could be deposed in the present case.

5. On 7 December 2000, Gloria Colburn, like Mrs. Johnson, filed a Complaint against David Glenn Hicks (the driver of the SUV), the Charles County Commissioners, the State of Maryland, and the Office of the Sheriff of Charles County, Maryland, as defendants, alleging that police officers had created a barricade with civilian vehicles. Ms.

Hicks (the driver of the SUV), the Charles County Commissioners, the State of Maryland, and the "Office of the Sheriff of Charles County, Maryland," [6] as defendants. The Complaint set forth claims of negligence in five separate counts, all arising from the pursuit of Hicks's SUV and its collision with the vehicle driven by Joseph Johnson on 25 August 1999. Mrs. Johnson amended the complaint on four occasions to reflect the death of Mr. Johnson in January 2001 and added causes of action, a request for punitive damages, and her daughter, Jolene Johnson, as a plaintiff. In the Fourth Amended Complaint, filed 19 February 2002, the Johnsons alleged claims under §§ 19–101 and 19–102 of the Transportation Article, among other claims, asserting that, immediately prior to the collision, Charles County police officers and/or Maryland State Troopers: (1) did not make any effort to move the observed civilian vehicles from the scene when they knew that the chase was approaching the intersection, (2) pursued Hicks negligently and/or recklessly, (3) created a roadblock using Mr. Johnson's vehicle as a means of enforcing the law and/or apprehending Hicks, and (4) directed Mr. Johnson to assist them in enforcing the law and/or apprehending Hicks.[7]

Following discovery, Petitioners moved for summary judgment on 18 August 2003. A hearing on the motion was held on 16 October 2003. The Circuit Court granted the Petition-

---

Colburn's case was consolidated with the Johnsons' case. The defendants moved for summary judgment on 18 August 2003. On 16 October 2003, the date of the summary judgment hearing, Ms. Colburn voluntarily dismissed her claims against the defendants.

6. The Circuit Court for Charles County determined that the "Office of the Sheriff" is not an entity capable of being sued, citing *Boyer v. State*, 323 Md. 558, 572 n. 9, 594 A.2d 121, 128 n. 9 (1991). Thus, the trial court held that the Respondents' claims against the "Office of the Sheriff" failed to state a claim upon which relief could be granted. That determination by the Circuit Court is not challenged in the case before this Court.

7. We note that, while the appeal in the present case was pending, the Johnsons filed a Complaint in the U.S. District Court for the District of Maryland; that lawsuit was dismissed.

ers' motion on the issue of liability under §§ 19–101 and 19–102.

The Circuit Court held that Petitioners were not liable under § 19–102, as a matter of law, because "unequivocal and purely objective evidence clearly establishe[d] that no officer directed or commandeered any non-police vehicle so as to utilize a non-police vehicle in a roadblock." Specifically, the court relied upon the following evidence:

[A]udio data recordings demonstrate that Sergeant McGuigan was in the center of the intersection for less than one minute, photographic evidence demonstrated that Trooper Ford's vehicle in no way blocked or impeded traffic on Route 301, the accident reconstruction of expert witnesses, through application of engineering principles, illustrated that no police vehicle was positioned as Plaintiff Colburn diagramed, and the pertinent documents from the State Highway Administration showed the traffic light sequence at the intersection at the time of the accident. Furthermore, even Gloria Colburn, who initially alleged this roadblock theory of liability, failed to testify during discovery that any officer commandeered or directed that a non-police vehicle be used in a roadblock. (Citations omitted).

The trial court also held that Petitioners were not liable for violation of § 19–101, as a matter of law, because the court concluded that no police officer in this case "directed" Mr. Johnson to assist them in any way. "Rather, the Plaintiffs were stopped at a red traffic signal at the intersection of Route 301 and Smallwood Drive before any officer arrived on the scene, and the Plaintiffs remained stopped for the signal in the seconds prior to the collision," (citing *Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078 (1986), for the proposition that an officer who has no special relationship with a victim has no duty to protect that victim from injury caused by another private citizen). The Johnsons appealed.

In an unreported opinion, the Court of Special Appeals vacated the summary judgments granted by the Circuit Court

on the Johnsons' §§ 19–101 and 19–102 claims.[8] The interme-
diate appellate court claimed that it reviewed the conflicting
evidence on the record in a light most favorable to the
Johnsons, including the evidence gathered from Ms. Colburn's
deposition, *supra*, where she stated that she stopped her
vehicle at the intersection due to police vehicles blocking
northbound Route 301 at the Smallwood Drive intersection.
The court noted that "[i]f Gloria Colburn's testimony at trial is
inconsistent with her deposition testimony, her deposition
testimony would be 'substantively' admissible under Md. Rule
5–802.1(a)(1)" or "[i]f Gloria Colburn is unavailable to testify at
trial (and her unavailability was not procured by the appel-
lants), her deposition testimony would be 'substantively' ad-
missible under Md. Rules 2–419(a)(3) and 5–804(b)(1)" at trial.
The intermediate appellate court concluded that "[u]nder
these circumstances, [it was] persuaded that the deposition
testimony of Gloria Colburn [was] sufficient to generate a jury
determination of whether—under the *Keesling* [*v. State*, 288
Md. 579, 420 A.2d 261 (1980),][9] 'totality of the circumstances'
test—Joseph Johnson was directed to assist the officers in
apprehending Mr. Hicks." Petitioners successfully sought our
review of this determination.

---

8. In addition to vacating the summary judgments entered on the
Johnsons' §§ 19–101 and 19–102 claims, the Court of Special Appeals
affirmed the summary judgments entered on all of the other causes of
action asserted by the Johnsons, who chose not to challenge the
judgment of the intermediate appellate court on those grounds.

9. In *Keesling v. State*, 288 Md. 579, 420 A.2d 261 (1980), we held that
substantial and material factual disputes existed as to whether a police
officer's approach to a civilian vehicle by use of a marked police car
with activated emergency equipment, which caused the civilian to pull
out of traffic and stop on the side of the road, and explanation to that
citizen about what was happening amounted to a direction or order to
the citizen to cooperate in the apprehension of criminals and/or di-
rection to participate in a blockade, thus precluding summary judgment
in favor of the defendants on the civilian's suit for injuries incurred in
the incident.

## II.

Petitioners contend that no genuine dispute of material fact exists on this record because the facts admissible in evidence establish that no police officer "directed" Joseph Johnson to assist them in enforcing the law or apprehending any person suspected of violating that law and that no police officer "directed" him to participate in a roadblock. Petitioners posit that our decision in *Keesling* and the legislative history of §§ 19–101 and 19–102 support the conclusion that, absent an active, affirmative command for assistance from a police officer to a civilian, the statutes do not come into play. Sections 19–101 and 19–102 are "remedial in nature" and, therefore, should be liberally construed. Yet, Petitioners maintain, under the plain meaning of §§ 19–101 and 19–102, it was improper for the Court of Special Appeals to apply the "totality of the circumstances" test as set forth in *Keesling.* Petitioners argued too that the "extreme facts" in *Keesling,* the only heretofor reported opinion construing §§ 19–101 and 19–102, are distinguishable from those of the present case.

In addition, Petitioners assert that the trial court's grant of summary judgment was appropriate because the facts presented in the record established that no police officer gave an active, affirmative, vocal command to Joseph Johnson to participate in a roadblock in the apprehension of Hicks. Thus, Petitioners contend that the Court of Special Appeals incorrectly concluded that the testimony of Ms. Colburn and the police officers created a genuine dispute of material fact regarding whether the police officers "directed" the drivers of the civilian cars to participate in a roadblock or assist in the apprehension of Hicks because the intermediate appellate court overlooked Ms. Colburn's testimony that she stopped at the intersection as a result of the red traffic light, remained there because of the light, and that no officer signaled to her or commanded her to take, or refrain from taking, any particular action.

Relying primarily on our decision in *Keesling,* Respondents retort that the Court of Special Appeals properly vacated the

summary judgment entered by the trial court. Respondents claim that §§ 19–101 and 19–102 of the Transportation Article are not implicated only by a vocal direction from police officers. By placing their marked police vehicles at the intersection with their emergency equipment activated, while some officers also physically stood in the intersection, the police officers, Respondents argue, signaled direction to Joseph Johnson and others to help them apprehend Hicks, albeit without using verbal commands. Although several police officers testified that their vehicles did not block the northbound lanes of Route 301, two, and perhaps three, motorists indicated that, from their perspective, it physically was impossible for them to enter or cross the intersection due to the police presence. Respondents assert that a jury reasonably could infer from these facts that the police officers' actions were the equivalent of a direct order to Joseph Johnson and other civilian drivers to remain stopped at the intersection.

In addition, Respondents argue that several facts would support a jury determination that police officers directed Joseph Johnson to participate in a roadblock. Actions of the police officers were interpreted by at least two civilian drivers as a direction to stay in their present location in lanes across northbound Route 301. Sergeant McGuigan removed stop sticks from the trunk of his vehicle and headed toward the empty median (apparently believed by him to be the only escape route for Hicks) when the accident occurred. Blocked lanes of traffic at the intersection of Route 301 and Smallwood Drive would present an opportunity for the police to attempt to force Hicks to the right shoulder of the highway thereby increasing their chances of deploying stop sticks successfully to force Hicks to stop. Corporal Boarman referred in a report to the stopped civilian cars as a "roadblock." Thus, Respondents claim, the Petitioners were not entitled to summary judgment.

### III.

We reiterate once again the following principles of summary judgment jurisprudence. Under Maryland Rule 2–

501(a), "[a]ny party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." [10] Although a summary judgment motion may be an appropriate vehicle to facilitate the efficient disposition of litigation, we also recognize that "the function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to ascertain whether there is a dispute as to a material fact sufficient to provide an issue to be tried." *Baltimore County v. Kelly*, 391 Md. 64, 73, 891 A.2d 1103, 1108 (2006) (quoting *Peck v. Baltimore County*, 286 Md. 368, 381, 410 A.2d 7, 13 (1979)). "Thus, '[i]n a summary judgment proceeding even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' " *Id.* (quoting *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256, 258 (1970)). (Alteration in original).

Whether a trial court's grant of summary judgment was proper is a question of law, subject to *de novo* review on appeal. *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006); *Livesay v. Baltimore*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In reviewing a grant of summary judgment, "we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Myers*, 391 Md. at 203, 892 A.2d at 529. We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Id.*

In *Keesling,* we considered whether a trial court's grant of summary judgment was legally correct on the ground that appellant Keesling had failed to allege properly a violation by

---

**10.** We apply the Md. Rule in effect when the summary judgment motion in the present case was filed on 23 August 2000.

the appellee State of the precursor to §§ 9–101 and 19–102 of the Transportation Article, which provided, under certain circumstances, for damages to a citizen who is injured as a consequence of the police having commandeered his or her motor vehicle to apprehend suspected criminals.[11] Maryland Code (1957, 1970 Repl.Vol.), Article 66½, § 9–102. On 1 August 1972, Officers Todd and Lacson of the Friendship [now Baltimore–Washington International/Thurgood Marshall] Airport Police Department investigated a call that a man and

---

11. At the time of the occurrence in *Keesling,* Maryland Code (1957, 1970 Repl.Vol.), Article 66½, § 9–102, provided, in pertinent part:

(a) *Commandeering vehicle and directing participation in road block prohibited.*—No police officer of this State, or of any political subdivision of this State, while acting within the scope of his authority in the enforcement of any law of the State or of the particular political subdivision, shall direct or order any operator, owner, or passenger of any motor vehicle within the limits of this State to assist him by commandeering the vehicle and directing the operator, owner, or passenger to participate in a road block in the apprehension of any person suspected of having committed or known to have committed a violation of law.

(b) *Damages or injuries from negligence of police officer.*—If any police officer of this State, or of any political subdivision of the State while acting within the scope of his authority in the enforcement of any law of this State or of the particular political subdivision, directs the operator of any motor vehicle (other than a police vehicle) within the limits of this State to assist him in the enforcement of the law or in apprehending any person suspected of having or known to have committed a violation thereof, the State or the political subdivision, as the case may be, shall be liable for damages or injuries proximately caused by the negligence of the police officer; provided, however, that the defenses of contributory negligence and "last clear chance" shall be available to the State or political subdivision.

\* \* \*

(c) *Damages or injuries from participation in road block.*—If any police officer of this State, or of any political subdivision of this State, while acting within the scope of his authority in the enforcement of any law of this State or of the particular political subdivision, directs the operator of any motor vehicle (other than a police vehicle) within the limits of this State to participate in a road block to assist him in the enforcement of such law or in apprehending any person, suspected of having or known to have committed a violation thereof, the State or the political subdivision, as the case may be, shall be liable for damages or injuries directly resulting from, or directly attributable to the participation in the road block; provided, however, that the defenses of contributory negligence and "last clear chance" shall be available to the State or political subdivision.

woman were attempting to depart from a nearby hotel without paying their bill. *Keesling,* 288 Md. at 580–81, 420 A.2d at 262. The officers stopped the suspects, Richard Dale and Laura Gray, and began to talk with them about the incident. *Keesling,* 288 Md. at 581, 420 A.2d at 262. Dale brandished a gun, disarmed the officers, and ordered the officers to drive him and Gray to Washington, DC, in their marked police car. *Id.* When the officers tried to persuade Dale that he should return to the hotel, Dale informed them that he could not because, while at the hotel, he shot a man. *Id.* Dale, Gray, and the two officers proceeded on Interstate 295 (the Baltimore–Washington Parkway) toward Washington, during which time the conversation occurring within the police car was transmitted over the police car radio because Officer Lacson left activated the microphone after initially advising the police dispatcher that he was enroute to Washington. *Id.*

The affidavits of Officers Todd and Lacson, in addition to other court papers, suggested that Dale ordered Officer Lacson to stop a blue vehicle that was proceeding along the Parkway in front of the police car, that the idea to stop the civilian vehicle was solely that of Dale, and that Officer Lacson tried to persuade Dale not to follow through with his plan. *Id.* An affidavit by Gray, however, stated that the idea to stop the civilian's vehicle was suggested by the officers. *Id.* Officer Lacson admitted to utilizing his emergency light and siren to stop the civilian vehicle. *Keesling,* 288 Md. at 582, 420 A.2d at 262. The vehicle pulled over, with Officer Lacson right behind it. *Id.*

Officer Lacson asked Dale if he could approach the vehicle before Dale did so that the civilian driver would not panic. *Id.* Dale agreed and Lacson approached the vehicle, explained to the driver what was happening, and then asked Dale not to hurt the driver. *Id.* Dale answered, "alright, get the hell out of here. . . . " Dale and Gray entered the civilian vehicle and ordered Ms. Keesling, the operator, to drive. *Id.* Officer Lacson entered a State police vehicle that had arrived on the scene and Officer Todd got back into his vehicle. The officers proceeded to follow Ms. Keesling's car. *Id.*

A prolonged chase ensued involving a helicopter, 35 police cars, and 2 motorcycles from several jurisdictions. *Keesling*, 288 Md. at 582, 591 n. 5, 420 A.2d at 262, 267, n. 5. The Keesling vehicle avoided two roadblocks and was finally stopped by a third "moving" roadblock. *Keesling*, 288 Md. at 582, 420 A.2d at 262. During the chase, Dale threatened to shoot Ms. Keesling. When his capture was inevitable, Dale shot himself instead. *Id.* Ms. Keesling brought a claim against the State of Maryland, alleging a violation of §§ 9–102(a), (b), and (c) of Article 66½ of the Maryland Code, claiming that, as a result of the incident, she suffered serious and permanent injuries. *Id.*

We noted that there was a dispute as to the material facts in *Keesling* because the affidavits and other factual averments conflicted over whether the idea to commandeer the Keesling vehicle was solely that of the suspects or whether it originated with the police officers. *Keesling*, 288 Md. at 590–91, 420 A.2d at 267. We concluded, after reviewing the legislative history of and common law antecedents to the statute, that this factual dispute was material to the outcome of the case. *See generally Keesling*, 288 Md. at 585–89, 420 A.2d at 264–66 (discussing the common law origin and legislative history of the statute). We also determined that the facts present in the record gave rise to jury questions as to whether:

(1) The officers suggested that the criminals make their escape in an unmarked vehicle; (2) the use of the beacon light and siren was a command to Keesling to stop which [the driver] did in obedience thereto; and (3) the officer's approach to the vehicle and explanation to Keesling of what was happening amounted to a direction or order to Keesling to cooperate in the apprehension of the criminals.

It is a question for the jury to decide whether this conduct of the police fell so far below the duty of police to protect the welfare of the public as to amount to negligence. *Keesling*, 288 Md. at 590–91, 420 A.2d at 267. In reaching that determination, we construed the statute as meaning that "commandeering" a vehicle and "directing participation in a

roadblock" could describe the alleged actions of Officers Todd and Lacson if the jury were to conclude that the officers' conduct amounted to ordering Keesling to participate in a roadblock, whether "the tactics employed by the officers ... were designed to free themselves from their captors so that they could resume the chase and apprehend the suspects in the roadblock in which the Keesling vehicle would be employed." *Keesling,* 288 Md. at 591, 420 A.2d at 267. "The jury could conclude [that] the officer ordered Keesling to cooperate, if not expressly, at least by the objective appearance of his words and actions ... [, which,] taken as a whole, were such that the officer must have known he would be interpreted as having commanded Keesling directly to cooperate." *Id.* We therefore construed implication of the statute as not to require an affirmative vocal command by the officer in order to satisfy the requirement for the officer to "direct" that a civilian participate in the apprehension of a suspect or participate in a roadblock.

We hold here that the trial court committed error when it granted Petitioners' summary judgment motion under the totality of the factual circumstances of the record in the present case. A material factual dispute arises from the conflicting affidavits of the police officers involved in the chase and at least the deposition of Ms. Colburn. Whether police vehicles actually blocked traffic traveling northbound on Route 301 (or appeared to block traffic from the civilian motorist's perspective) is a dispute for the fact-finder to resolve when evaluating the claims brought under §§ 19–101 and 19–102.

Like the Court of Special Appeals, we conclude that the record presents a jury question as to whether the objectively-viewed appearance of the police officers' conduct amounted to a direction or order for Joseph Johnson to participate in the apprehension of Hicks and/or in a roadblock for that purpose. Several marked police vehicles were gathered in some kind of formation in the intersection of Route 301 and Smallwood Drive. The vehicles' emergency equipment was activated and was visible to motorists approaching and stopping at the intersection. Two police officers exited their vehicles and

were standing, walking, and/or running about the intersection within view of the motorists. Civilian motorists, including Joseph Johnson, could have inferred reasonably from the presence of the stopped vehicles, police officers, and activated emergency lights and sirens, a direction to remain stopped at the intersection, regardless of the color of the overhead traffic signals; Ms. Colburn's testimony is consistent with such a conclusion. Police officers tried to employ stop sticks on the shoulder of Route 301 because it was thought to be the only "free" area on Route 301 northbound for the Hicks vehicle to use. That this necessarily may have been so was due in large measure to the stopped civilian vehicles in the northbound lanes. Officers, some with knowledge of the direction of Hicks' speeding vehicle, may not have attempted to clear the motorists from the intersection. The trial judge, in granting summary judgment, construed incorrectly the meaning §§ 19–101 and 19–102 when he, in effect, interpreted those statutes to require an affirmative vocal order to participate in the blockade or apprehension of the fleeing suspect, in contravention of our holding in *Keesling.*

We observe too that the trial court committed error when it seemed to assess the credibility of the evidence. The trial judge stated that he chose to believe the evidence presented in a reconstruction of the accident, indicating that police vehicles did not block northbound traffic on Route 301, over the testimony of the civilian motorists indicating an opposing scenario. As stated, *supra,* we have recognized that "the function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to ascertain whether there is a dispute as to a material fact sufficient to provide an issue to be tried." *Kelly,* 391 Md. at 73, 891 A.2d at 1108 (quoting *Peck,* 286 Md. at 381, 410 A.2d at 13). The record in the present case presents triable issues of fact for the fact-finder.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.