36 A.3d 941

**Michelle D'AOUST**

**v.**

**Cindy R. DIAMOND, et al.**

**No. 5, Sept. Term, 2011.**

Court of Appeals of Maryland.

Jan. 31, 2012.

550

558

**560**

Jonathan A. Azrael (Azrael, Franz, Schwab & Lipowitz, LLC, Baltimore, MD) on brief, for Petitioner/Cross–Respondent.

Howard G. Goldberg (Robin G. Banks of Goldberg, Besche & Banks, P.C., Baltimore, MD), on brief, for Respondents/Cross–Petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, JOSEPH F. MURPHY, JR.* (Retired, specially assigned), JJ.

GREENE, J.

This case stems from the judicial sale of a condominium owned by Michelle D'Aoust (Petitioner) conducted by court-appointed trustees Cindy R. Diamond and Bruce D. Brown, who were employed by the law firm of Rosen Hoover, P.A. (collectively Respondents) at the time of the sale and surrounding events in connection with the sale. Following the sale of the condominium, Petitioner filed a Complaint in the Circuit Court for Harford County alleging breach of fiduciary duty involving actual fraud and breach of fiduciary duty involving constructive fraud by Diamond and Brown in connection with the sale. The Complaint also alleged vicarious liability of Rosen Hoover, P.A. Thereafter, Respondents filed a Motion to Dismiss the Complaint, which the trial judge granted, concluding that Respondents were entitled to qualified judicial immunity for their actions in connection with the sale of Petitioner's condominium.[1] The Court of Special Appeals

---

* Murphy, J., now retired, participated in the hearing and in the conference of this case in regard to its decision after being recalled pursuant to the Constitution, Art. IV, Sec. 3A but did not participate in the adoption of this opinion.

1. The trial judge dismissed the claims against Diamond and Brown on the theory of qualified judicial immunity. The trial judge also dismissed the claim of vicarious liability against Rosen Hoover, P.A., concluding that because this was the only alleged basis of liability, resulting solely from the underlying allegations against Diamond and Brown, Rosen Hoover, P.A. was entitled to the same immunity shield.

reversed the trial judge's grant of Respondents' Motion to Dismiss with regard to Petitioner's allegations of actual fraud, remanding the case to the trial court for further proceedings on that cause of action, and it affirmed the trial judge's grant of the Motion to Dismiss with regard to the other causes of action in Petitioner's Complaint on grounds of qualified judicial immunity. We granted *certiorari* to answer the following questions posed by Petitioner in her petition for writ of certiorari:

(1) Does the doctrine of "qualified immunity" shield trustees appointed to make a judicial sale from liability for: [ (a) ] failing to provide the property owner with a mandatory notice of the time, place and terms of the sale "to the last known address" of the record owner, as required by Maryland Rule 14–206(b); and/or [ (b) ] making a false affidavit that they had complied with the Rule? [2]

(2) Are the trustees entitled to "qualified immunity" where prior to a hearing on [Petitioner's] Exceptions to the foreclosure sale, the trustees told the [Petitioner] that the trustees were withdrawing objections to her Exceptions and would advise the court that no hearing was required because the Exceptions should be sustained; subsequently, after the hearing was cancelled at the trustees' request, the Circuit Court summarily ratified the [sale] without a hearing, the trustees did not advise the court that the sale should not have been ratified, but instead conveyed the property to the foreclosure sale purchaser without further notice to the [Petitioner]?

(3) Is the Court of Special Appeals correct in holding that the trustees are entitled to assert the defense of qualified immunity for the ministerial act of sending out a required

---

Because the petition for writ of certiorari is limited to the issue of immunity, we limit our discussion on review to whether all Respondents are entitled to absolute judicial immunity or any qualified immunity.

**2.** Petitioner's references to Maryland Rule 14–206(b)(2) and Maryland Rule 14–206(b)(5) pertain to the version of the Rule in effect at the time of the judicial sale of Petitioner's condominium in 2005.

Notice because such act is a "nested" ministerial act, "necessary to carry out a broader discretionary authority vested by the court?"

(4) Is the Court of Special Appeals correct in holding that "[the trustees] are shielded from liability for constructive fraud as a matter of law" because of the doctrine of "qualified immunity?"

(5) Does the doctrine of qualified immunity protect foreclosure sale trustees who negligently deprive the property owner of a hearing on exceptions to the sale?

We also granted *certiorari* to answer the following question posed by Respondents in their cross-petition:

Whether the Court of Special Appeals should have considered the uncontradicted affidavits submitted by the [Respondents] (in which they denied actual knowledge that the [Petitioner] was not residing in the condominium where the notice was sent), and thus should have reviewed the trial court's Order as the granting of a motion for summary judgment, rather than the granting of a motion to dismiss since the extraneous documents were not excluded by the trial court in rendering its opinion?

For the reasons discussed more fully below, we shall affirm in part and reverse in part the judgment of the Court of Special Appeals, and we direct that court to remand the case to the trial court for further proceedings.[3] We hold that the inter-

---

3. We emphasize that our holding is limited to a discussion and analysis of only those issues presented in the petition for writ of certiorari and cross-petition for writ of certiorari. Furthermore, we note that our legal determination that a trustee is not entitled to immunity, absolute or qualified, has no bearing on whether collateral estoppel is available for offensive or defensive purposes or whether res judicata would prevent the claims advanced by Petitioner. Those issues have not been raised in this Court. *See R & D 2001, LLC v. Rice,* 402 Md. 648, 663, 938 A.2d 839, 848 (2008) (explaining the elements of res judicata); *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.,* 361 Md. 371, 391, 761 A.2d 899, 909 (2000) (quoting *Wash. Suburban Sanitary Comm'n v. TKU Assocs.,* 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977)) (enumerating the four-part test for collateral estoppel). Consideration of the underlying facts, as well as the factual and legal determinations made by the judge, in the judicial sale case, may be necessary to evaluate the issues in this

mediate appellate court erred in reviewing the trial judge's Order as a grant of a motion to dismiss, rather than as a grant of a motion for summary judgment. We also hold that the trial judge erred in granting, and the intermediate appellate court erred in affirming the grant of, Respondents' Motion to Dismiss on grounds of qualified judicial immunity, as that doctrine has not been adopted by this Court. We hold that the conduct of Diamond and Brown in sending notice of the Petition for Sale to the condominium address, in subsequently filing an affidavit affirming that they gave such notice, and in communicating with the hearing judge regarding Petitioner's exceptions to the sale, conduct alleged to be improper in Petitioner's Complaint, did not entitle the trustees to absolute judicial immunity as they were not judicial officers at the time the alleged acts were performed. Furthermore, we hold that Rosen Hoover, P.A. was not a judicial officer at the time of the events alleged in Petitioner's Complaint, and therefore, Rosen Hoover, P.A. is not entitled to receive absolute judicial immunity. Lastly, we hold that the concept of qualified public official immunity is inapplicable to the circumstances of this case.[4] Therefore, to the extent that the trial judge granted,

---

case more fully. For example, in the judicial sale case Petitioner filed a Motion to Revise and Strike Judgment Based on Fraud, Mistake, and Irregularity, and following a hearing on the matter, the presiding judge issued a Memorandum Opinion ratifying the sale and concluding that while he "remain[ed] concerned about the original manner of service in this case," there was no evidence that "the sale, foreclosure or ratification were somehow procured by fraud, mistake, or irregularity" sufficient to set aside the sale.

4. We note that the doctrine of qualified public official immunity was not specifically raised by Petitioner in her petition for writ of certiorari, nor was this doctrine discussed by the parties in their Briefs to this Court. For purposes of clarifying the issues presented, however, we discuss and analyze the concepts of both absolute judicial immunity and qualified public official immunity, as the two doctrines appear to have been conflated in the trial and intermediate appellate courts' analysis of the issues in this case. See Parker v. State, 337 Md. 271, 284–85, 653 A.2d 436, 442 (1995) (maintaining that this Court has "distinguished between the qualified and narrower immunity for discretionary acts generally accorded to public officials, and absolute judicial immunity, which, unlike qualified immunity, applies regardless of the

and the Court of Special Appeals affirmed the grant of, Respondents' Motion to Dismiss on grounds of immunity, we hold that such determinations were in error.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 7, 2008, Petitioner filed suit against Respondents in the Circuit Court for Harford County. Petitioner's Complaint contained the following relevant factual allegations:

2. Defendants Cindy R. Diamond and Bruce D. Brown are Petitioners and court-appointed Trustees in the [judicial sale] case styled *Diamond, et al. v. D'Aoust*, Case No. 12–C–05–364, in the Circuit Court for Harford County ("the Petition for Sale").[5]

\* \* \*

6. Defendants Diamond and Brown [were] appointed Trustees to sell the Property, [located at 108 E. Seevue Court in the Hickory Hills Condominium Development,] by Order

---

nature of the tort"); *Fox v. Wills*, 390 Md. 620, 635, 890 A.2d 726, 734 (2006) (discussing judicial immunity, in an opinion of this Court decided after the Court of Special Appeals issued its decisions in *Rice v. Dunn*, 81 Md.App. 510, 568 A.2d 1125 (1990) and *Tucker v. Woolery*, 99 Md.App. 295, 637 A.2d 482 (1994), wherein we made clear that "nonjudicial personnel appointed by courts for particular purposes, have no immunity from suit under the common law").

5. For purposes of furnishing a background of the events leading up to the judicial sale of Petitioner's condominium unit, we provide the following account from the trial judge's Memorandum Opinion in this case:

Ms. D'Aoust was the owner of a condominium known as 108 E. Seevue Court in the Hickory Hills Condominium Development in Harford County.... As in all condominium developments, Unit Owners are required to pay a monthly assessment for the common use and benefit of all Unit Owners for common expenses. There is no dispute that the monthly assessment for Ms. D'Aoust's unit was $140.00.

The Petition for the Sale of Ms. D'Aoust's unit alleged that she had defaulted in the payment of her monthly assessments. Prior to the filing of the Petition for Sale, a Statement of Condominium Lien was filed among the land records of Harford County.... The Petition for Sale alleged that as of December 31, 2004, Ms. D'Aoust had unpaid assessments plus interest and costs of collection totaling $4,775.31.

dated March 14, 2005.[6] The Property was sold by the Trustee[s] at [a] public sale on May 26, 2005 for $65,000.00. There was no existing mortgage on the Property [as of] the date of Sale.

7. On August 3, 2004 ... Plaintiff notified MRA Property Management, Inc. ("MRA"), the managing agent for the Hickory Hills Condominium, that she relocated to a new address at 11010 Bowerman Road, White Marsh, Maryland 21162, and that all correspondence should be sent to her at that address.

8. On August 3, 2004, MRA sent an email to the Law Firm [Rosen Hoover, P.A.] advising that Plaintiff had a new address of 11010 Bowerman Road in White Marsh, Baltimore County. . . .

9. As members of the Law Firm, the Defendants Diamond and Brown had actual or constructive knowledge that Plaintiff's address was 11010 Bowerman Road, White Marsh, Baltimore County, Maryland.

10. Despite [their] knowledge, the Defendants Diamond and Brown, as members of the Law Firm and as Trustees, on May 10, 2005 directed the Notice of the Sale of Plaintiff's Property to the Property address, rather than 11010 Bowerman Road.

11. Likewise, the Defendants Diamond and Brown caused the Notice of Intention to Create a Lien to be posted on the Property, and did not serve or mail a copy of said Notice to Plaintiff at her address at 11010 Bowerman Road.[7]

---

6. The judge presiding over the judicial sale proceedings in the Circuit Court for Harford County entered a Decree for Sale of Premises, filed on March 15, 2005. The Decree stated that it was "ADJUDGED, ORDERED AND DECREED, that the property in the proceedings be sold [and] that Cindy R. Diamond and Bruce D. Brown be and are hereby appointed Trustees to make said sale[.]" The Decree included specific requirements by which the "course and manner of the[] proceedings" were to be conducted by Diamond and Brown, acting as court-appointed trustees.

7. Although Petitioner's Complaint mentions lack of proper service of the Notice of Intention to Create a Lien, this factual allegation is not

12. As a result of the failure of Defendants Diamond and Brown to send Notice of the Sale to Plaintiff at 11010 Bowerman Road, Plaintiff did not know that her Property was sold on May 26, 2005. Had Plaintiff been advised of the sale by notice at 11010 Bowerman Road, she would have taken steps to prevent the Sale by paying the condominium lien, and/or would have attended the sale to bid on the Property.

\* \* \*

14. On or about July 5, 2005, Plaintiff filed exceptions to the sale in the Circuit Court for Harford County.

15. A hearing on Plaintiff's exceptions was scheduled for August 31, 2005.

16. Prior to the hearing, Defendant Cindy Diamond told Plaintiff that the Trustees were withdrawing objections to the exceptions and would advise the Court that no hearing was required because the exceptions should be sustained.

17. Defendants Diamond and Brown subsequently withdrew objections to the exceptions but did not advise the Court that the exceptions should be sustained and the sale not ratified.

18. The Court ratified the [sale] without a hearing on September 14, 2005 ([Order] filed October 3, 2005). Although Defendants Diamond and Brown knew that the Court's ratification was ordered without knowledge that the sale had been made without adequate notice to Plaintiff, the Defendants did not advise the Court, but instead conveyed the [P]roperty[,] without further notice [to] Plaintiff, to the party who purchased it at the public sale, with the intent of depriving Plaintiff of obtaining reconsideration of the September 14, 2005 ratification order.

expressly contained within any cause of action in Petitioner's Complaint, it is not discussed by either of the parties in the papers filed with the trial court, and it is not addressed in the parties' Briefs filed with this Court. Therefore, this factual allegation is not material to our analysis, and we do not address it.

Petitioner incorporated the foregoing factual allegations into the three counts contained in the Complaint. The first count, entitled "Breach of Duty," included the following relevant allegations:

21. In proceeding with a judicial sale of Plaintiff's Property, Defendants Diamond and Brown owed a fiduciary duty to Plaintiff to conduct the proceedings in accordance with Maryland law and the Maryland Rules of Procedure, including without limitation, Maryland Rule 14–206(b)(2).

22. Defendants Diamond and Brown breached their fiduciary duty owing to Plaintiff by failing to send Notice of Sale of Plaintiff's Property to her last known address, i.e., 11010 Bowerman Road, White Marsh, Maryland 21162, as required by § 14–203(a) of the Real Property Article (Maryland Contract Lien Act).

23. Defendants Diamond and Brown further breached their fiduciary duty and committed actual fraud by filing a false or incorrect Affidavit in the Petition for Sale case stating that they had sent Notice of the Sale of Plaintiff's Property to her at her last known address.

The second count of Petitioner's Complaint, entitled "Constructive Fraud," included the following relevant allegations:

27. The failure of Defendants Diamond and Brown to provide notice to Plaintiff in accordance with Maryland law and the Maryland Rules of Procedure amounts to constructive fraud under the doctrine of *Jannenga v. Johnson*, 243 Md. 1, 220 A.2d 89 (1966).

28. Defendants Diamond and Brown further committed constructive fraud in not advising the Court that they had failed to give Plaintiff a proper notice of the sale of her condominium unit, but instead conveying the unit to the purchasers.

The third count of Petitioner's Complaint, entitled "Vicarious Liability," included the following relevant allegations:

30. At all relevant times, Defendants Diamond and Brown were acting as agents for Defendant[ ] [Rosen Hoover, P.A. (the Law Firm) ] . . . their employer[.]

31. The acts and omissions of Defendants Diamond and Brown, alleged herein, were committed within the scope of their duties for ... the Law Firm.

32. The Defendant[ ] ... Law Firm [is] vicariously liable for the wrongful acts and omissions of Defendants Diamond and Brown.

Respondents thereafter filed a Motion to Dismiss Petitioner's Complaint on June 26, 2008, incorporating a Memorandum of Law in Support and two affidavits, one from Diamond and one from Brown. In their Memorandum, Respondents claimed that their actions fully complied with the applicable provisions of the Real Property Article of the Maryland Code, as well as the By–Laws of the Hickory Hills Condominium Association. The affidavits filed with the Motion to Dismiss maintained that Diamond and Brown were not aware that Petitioner "was not residing at the Property which was the subject of the sale." In the alternative, Respondents claimed that "[e]ven if Diamond and Brown failed to provide proper notice, as alleged by [Petitioner], their actions are protected by the doctrine of judicial immunity." Therefore, Respondents asserted, whether they had complied with the applicable procedural mandates or not, Petitioner's Complaint failed to state a claim upon which relief could be granted. Petitioner then filed a Response to Respondents' Motion to Dismiss, and in her Memorandum of Law attached thereto, Petitioner maintained that Respondents were not, in fact, entitled to the shield of judicial immunity for their actions.

The trial judge issued an Order and Memorandum Opinion on August 31, 2009. The Memorandum Opinion began with the assertion that the case was before the court "on cross motions for summary judgment." The Order issued by the court similarly directed that "Defendants' cross motions for summary judgment are hereby **GRANTED.**" The trial judge wrote in the Memorandum Opinion, however, that "the Court believes that the Defendants' Motion to Dismiss should be **GRANTED.**" In addition, the judge discussed in the standard of review section of his Memorandum Opinion, the appropriate standard with which to review a motion to dismiss. The

judge later amended his initial Order and issued a new Order on September 4, 2009, granting "Defendants' Motion to Dismiss[.]"

In his discussion of the relevant law, the trial judge cited *Merryman v. Bremmer*, 250 Md. 1, 241 A.2d 558 (1968) and *Lurman v. Hubner*, 75 Md. 268, 23 A. 646 (1892), for the proposition that "where there is a judicial sale of property, the court itself is a vendor and any trustee appointed to make the sale is an agent of the court for that purpose." The trial judge went on to reference *Rice v. Dunn*, 81 Md.App. 510, 568 A.2d 1125 (1990), in his analysis of judicial immunity, concluding that "judicial officers are immune from civil actions if the action in question that was performed by the judicial officer was discretionary and not ministerial and [was] within the jurisdiction of the officer's authority." Further, the trial judge relied on the Court of Special Appeals decision in *Tucker v. Woolery*, 99 Md.App. 295, 637 A.2d 482 (1994), to support his conclusion that trustees are entitled to qualified judicial immunity in their performance of judicial acts. Ultimately, the judge concluded that Diamond and Brown did not do "anything beyond the scope of their authority which would lead to their losing the qualified immunity that they have as trustees and to justify them being held personally liable [to Petitioner]." The trial judge also determined that because the doctrine of judicial immunity protects Diamond and Brown, Rosen Hoover, P.A. is immune from vicarious liability.

Petitioner noted an appeal to the Court of Special Appeals, *D'Aoust v. Diamond*, 197 Md.App. 195, 13 A.3d 43 (2010). The intermediate appellate court reviewed the trial judge's determination as a grant of a motion to dismiss, rather than as a grant of a motion for summary judgment, reasoning that "[t]o the extent that the trial court relied on the evidence outside the pleadings, that was done in the alternative." *D'Aoust*, 197 Md.App. at 205, 13 A.3d at 49. The court began its analysis with a historical review of the doctrine of judicial immunity, stating that judges have long been afforded absolute judicial immunity from all civil liability. *D'Aoust*, 197 Md.App. at 206–07, 13 A.3d at 50. The court then referred to

its opinion in *Tucker* to explain the concept of qualified immunity and the three-part test outlined in that case to determine whether a judicial officer is entitled to assert the defense of qualified immunity. *D'Aoust,* 197 Md.App. at 207, 13 A.3d at 51. The court discussed each step of the test: (1) whether the act was performed by a judicial officer; (2) whether the act was discretionary rather than ministerial; and (3) whether the act was within the jurisdiction of the officer. *D'Aoust,* 197 Md.App. at 208, 13 A.3d at 51 (quoting *Tucker,* 99 Md.App. at 300–301, 637 A.2d at 484).

The court began its analysis of the three-part test by noting that the parties do not dispute that Diamond and Brown were acting as judicial officers at the time of the sale, nor do they dispute that Respondents "acted within their delegated jurisdiction to dispose of the property by sale." *D'Aoust,* 197 Md.App. at 209, 13 A.3d at 51. Thus, according to the intermediate appellate court, the only issue in contention was whether the acts performed by Respondents were discretionary or ministerial. The court determined that "[n]early every judicial officer's duties will include some ministerial act necessary to carry out a broader discretionary function." *D'Aoust,* 197 Md.App. at 210, 13 A.3d at 52. Relying on the United States Supreme Court's opinion in *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993), the intermediate appellate court espoused the proposition that "nested" ministerial acts should be afforded immunity. *D'Aoust,* 197 Md.App. at 210, 13 A.3d at 52. Thus, the court held that Respondents are "entitled to qualified immunity for a particular ministerial act[, *i.e.,* sending notice,] necessary to carry out a broader discretionary authority vested by the court." *D'Aoust,* 197 Md.App. at 210–11, 13 A.3d at 52.

Having determined that Respondents were entitled to qualified judicial immunity,[8] the intermediate appellate court went

---

8. While the Court of Special Appeals did not explicitly state its holding with regard to Rosen Hoover, P.A., it expressed in a footnote that "[t]he parties agree that Rosen Hoover's *respondeat superior* liability is contingent upon Diamond and Brown's individual liabilities, and their defens-

on to analyze whether the allegations in Petitioner's Complaint were sufficient to overcome this immunity. *D'Aoust*, 197 Md.App. at 211, 13 A.3d at 52. The court initially determined that because "failure to provide notice as required by statute or rule in a judicial sale constitutes constructive fraud, which is itself a breach of duty," Petitioner's claim for breach of duty was subsumed within her claim for redress on grounds of constructive fraud. *D'Aoust*, 197 Md.App. at 211–12, 13 A.3d at 53. The court next determined that, although Petitioner's Complaint violated Maryland Rule 2–305,[9] with respect to the allegations of actual fraud, by failing to plead that cause of action in a separately numbered count, any objections to this defect in formality were waived by Respondents. *D'Aoust*, 197 Md.App. at 213, 13 A.3d at 54. Thus, the court considered the sufficiency of Petitioner's two remaining claims against Diamond and Brown, one for constructive fraud and one for actual fraud. In determining that "the distinction between torts that are shielded by qualified immunity and torts that are not shielded by qualified immunity is 'intent,'" the court distinguished the two remaining causes of action in the instant case. *D'Aoust*, 197 Md.App. at 215–16, 13 A.3d at 55. Because constructive fraud is not an intentional tort, the court concluded that Respondents were shielded under the qualified immunity doctrine for causes of action based on constructive fraud as a matter of law. *D'Aoust*, 197 Md.App. at 216, 13 A.3d at 56. In contrast, the court held that qualified immunity

---

es are identical in these preliminary proceedings." *D'Aoust*, 197 Md. App. at 199 n. 1, 13 A.3d at 46 n. 1. We conclude from this statement that the intermediate appellate court's holding with respect to the immunity of Rosen Hoover, P.A. was dependent upon, and identical to, the court's determination regarding the immunity of Diamond and Brown.

9. Maryland Rule 2–305 provides, in relevant part:
 A pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought.
 The comments to this Rule indicate:
 Under this Rule separate causes of action are required to be contained in separately numbered counts[.]

does not shield Respondents from liability for intentional torts such as actual fraud. Therefore, according to the Court of Special Appeals, because the facts alleged in Petitioner's Complaint and the reasonable inferences drawn therefrom were sufficient to support a cause of action for actual fraud, it was improper for the trial court to grant Respondents' Motion to Dismiss for that cause of action on grounds of qualified judicial immunity. *D'Aoust*, 197 Md.App. at 217, 13 A.3d at 56.

Following the mandate of the Court of Special Appeals, Petitioner filed a petition for writ of certiorari and Respondents filed a cross-petition, both of which we granted. *D'Aoust v. Diamond*, 418 Md. 586, 16 A.3d 977 (2011).

## DISCUSSION

### A. Standard of Review

As noted, *supra*, there was some confusion in the trial judge's Order and Memorandum Opinion as to whether the judge was granting a motion to dismiss or a motion for summary judgment. The resolution of this issue will guide our analysis of the propriety of the trial judge's determinations and the intermediate appellate court's holding upon review of those determinations.

■ When ruling on a motion to dismiss, "consideration of the universe of 'facts' pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any." *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 475, 860 A.2d 871, 879 (2004). When confronted with the issue of whether a trial judge has treated a filing made by a party as a motion to dismiss or a motion for summary judgment, Maryland Rule 2–322(c) provides, in relevant part:

> If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment

and disposed of as provided in Rule 2–501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501.

We have interpreted this Rule to mean that "[w]hen a party presents factual matters outside the pleadings, and the [trial judge] does not exclude them from consideration in the course of acting on a facial motion to dismiss, the [trial judge] must treat the motion as a motion for summary judgment." *Dual, Inc. v. Lockheed Martin Corp.,* 383 Md. 151, 161, 857 A.2d 1095, 1100 (2004). If a trial judge has been presented with facts or allegations outside of those in the complaint and has not specifically excluded them from consideration, we have acted on the presumption that the additional information was considered by the trial judge. *See 120 W. Fayette St., LLLP v. Mayor & City Council of Balt.,* 407 Md. 253, 263, 964 A.2d 662, 667 (2009) (concluding that "[b]y relying on material outside of the pleadings when granting the City's motion to dismiss, the Circuit Court, in effect, converted the motion to dismiss into a motion for summary judgment"); *Smith v. Danielczyk,* 400 Md. 98, 105, 928 A.2d 795, 799 (2007) (holding that because "[t]he record does not indicate that the extraneous documents or averments were 'excluded' by the court ... we must assume that they *were* considered"); *Okwa v. Harper,* 360 Md. 161, 177, 757 A.2d 118, 127 (2000) (determining that the motion should be treated as a motion for summary judgment because "[t]he trial judge did not expressly exclude the parties' affidavits and, at the motions hearing, appears to have referred to language found in [the plaintiff's] affidavit").

■ In his Memorandum Opinion, the trial judge, in the present case, included a detailed account of the events leading up to the judicial sale of the condominium, Respondents' actions with regard to the sale, and the subsequent judicial proceedings in connection with the sale. These facts were clearly outside of Petitioner's Complaint; in fact, a large portion of the factual and procedural background recounted by the trial judge was not contained in any of the papers filed by the parties in the civil suit. In addition, accompanying Respondents' Motion to Dismiss were two affidavits, one from

Diamond and one from Brown, that the trial judge did not specifically exclude from consideration in his Memorandum Opinion. Thus, the trial judge clearly looked outside the "four corners of the complaint" in reviewing Respondents' Motion to Dismiss, thereby converting it into a Motion for Summary Judgment.

Pursuant to Maryland Rule 2-501, we have stated that "[a] trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 329, 992 A.2d 459, 471 (2010) (internal quotation omitted). A determination of "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of College Park*, 415 Md. 475, 498, 3 A.3d 421, 434 (2010); *Conaway v. Deane*, 401 Md. 219, 243, 932 A.2d 571, 584 (2007); *Charles Cnty. Comm'rs v. Johnson*, 393 Md. 248, 263, 900 A.2d 753, 762 (2006). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is de novo, that is, whether the trial court's legal conclusions were legally correct." *Messing v. Bank of Am., N.A.*, 373 Md. 672, 684, 821 A.2d 22, 28 (2003) (citations omitted).

On review of an order granting summary judgment, our analysis "begins with the determination [of] whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law." *Appiah v. Hall*, 416 Md. 533, 546, 7 A.3d 536, 544 (2010) (citing *O'Connor v. Balt. Cnty.*, 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004)). Our review of the record is independent "to determine whether the parties properly generated a dispute of material fact. . . ." *Charles Cnty. Comm'rs*, 393 Md. at 263, 900 A.2d at 762. The record is reviewed "in the light most favorable to the non-moving party and [we] construe any reasonable inferences that may be drawn from the well-pled facts against the moving party." *Muskin v. State Dep't of Assessments & Taxation*, 422 Md. 544, 554-55, 30 A.3d 962, 968 (2011);

*Conaway,* 401 Md. at 243, 932 A.2d at 585; *O'Connor,* 382 Md. at 111, 854 A.2d at 1196; *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001). With regard to whether a fact is material, this Court has stated, "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *O'Connor,* 382 Md. at 111, 854 A.2d at 1196 (quoting *Lippert v. Jung,* 366 Md. 221, 227, 783 A.2d 206, 209 (2001)). In other words, a material fact is a fact "necessary to resolve the controversy as a matter of law[.]" *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974). If it is determined that no genuine dispute of material fact exists, "we review the trial court's ruling on the law, considering the same material from the record and deciding the same legal issues as the circuit court." *Messing,* 373 Md. at 684, 821 A.2d at 28 (citation omitted); *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (holding that "[i]f no material facts are placed in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law" (citations omitted)). In conducting our review of a grant of a motion for summary judgment, we consider "only the grounds upon which the trial court relied in granting summary judgment." *River Walk Apartments, LLC v. Twigg,* 396 Md. 527, 541–42, 914 A.2d 770, 779 (2007) (quoting *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006)).

Upon our review of the record in this case, we hold that there was no genuine dispute of any material facts necessary to the determination of whether Respondents were entitled to immunity. The undisputed material facts, which were before the trial judge when ruling on the Motion to Dismiss, were essentially that: Diamond and Brown were trustees appointed by the court to conduct a judicial sale of Petitioner's condominium; Diamond and Brown, in their capacity as trustees, gave notice of the sale at the condominium address, conducted the sale of the condominium unit, and communicated with the presiding judge regarding Petitioner's exceptions in the judi-

cial proceedings following the sale; and Rosen Hoover, P.A. was a law firm that employed Diamond and Brown during the time of the judicial sale and surrounding events in connection with the sale. While the parties may dispute the propriety of several of Respondents' actions, there is no genuine dispute, from our reading of the record, with regard to any of the aforementioned facts that are material to our analysis of the issue of immunity, absolute or qualified. Thus, because there is no genuine dispute of material fact, we base our review of the trial judge's grant of Respondents' Motion to Dismiss on whether Respondents were entitled to immunity as a matter of law. As discussed and explained more fully below, it was improper for the trial judge to grant, and for the Court of Special Appeals to affirm the grant of, Respondents' Motion to Dismiss, as Respondents are not entitled to either absolute judicial immunity or qualified public official immunity as a matter of law.

## B. Judicial Sale Process

It is informative to our analysis to engage in a discussion of the process by which judicial sales are commenced, executed, and finalized. We therefore give an overview of the applicable rules and statutes that govern such a transaction,[10] focusing specifically on the facts as alleged in the Complaint in the instant case and supplementing additional background information from the judicial sale case as necessary.

The By–Laws of the Hickory Hills Condominium Association provided that Petitioner, similar to all condominium owners, was required to pay a monthly assessment fee. This provision of the By–Laws was subject to enforcement in accordance with § 11–110(d) of the Real Property Article of the Maryland Code, which states, in relevant part, that "[p]ayment of assessments, together with interest, late charges, if any, costs of collection and reasonable attorney's fees may be

---

**10.** The rules and statutory provisions discussed herein were those in place at the time of the judicial sale of Petitioner's condominium in May 2005.

enforced by the imposition of a lien on a unit in accordance with the provisions of the Maryland Contract Lien Act." Md.Code (1974, 2003 Repl.Vol.), § 11–110(d) of the Real Property Article. In *Greenbriar Condo., Phase I Council of Unit Owners, Inc. v. Brooks*, 387 Md. 683, 746, 878 A.2d 528, 566 (2005), a case with facts similar to those in the underlying judicial sale case, we explained the statutory support for this requirement, stating, "The Maryland Condominium Act, Md. Code ( [ ] 1974, 2003 Repl.Vol.), § 11–110 of the Real Property Article, enables a condominium council of unit owners to require the payment of annual assessments from unit owners and the Maryland Contract Lien Act, Md.Code (1985, 2003 Repl.Vol.), §§ 14–201 *et seq.* of the Real Property Article, provides the procedure for the filing of liens against a condominium owner's unit when an owner does not pay those assessments." When Petitioner failed to pay the assessment fee required by the By–Laws, the Condominium Association, through its attorney, filed papers with the court to create a lien pursuant to Md.Code (1985, 2003 Repl.Vol.), § 14–203 of the Real Property Article.

The Maryland Contract Lien Act, referenced in the Maryland Condominium Act, provides that "[a] lien may be enforced and foreclosed by the party who obtained the lien in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deeds of trust on property in this State containing a power of sale or an assent to a decree." Md.Code (1985, 2003 Repl.Vol.), § 14–204(a) of the Real Property Article. Maryland Rule 14–201(a) provides, in relevant part, that "[t]he rules in this Chapter apply to foreclosure of liens upon property that are created or authorized to be created by a lien instrument or are created by a statute providing for foreclosure in the manner specified for foreclosure of mortgages." "Lien instrument" is defined by Maryland Rule 14–201(b)(5) as:

[A] *mortgage, a deed of trust,* a land installment contract, including those defined in Code, Real Property Article § 10–101(b), a contract creating a lien pursuant to Code, Real Property Article, §§ 14–201 through 14–205, a deed or

other instrument reserving a vendor's lien, *an instrument creating or authorizing the creation of a lien in favor of a* homeowners' association, *a condominium council of unit owners,* a property owners' association or a community association, a security agreement, and any other instrument creating or authorizing the creation of a lien upon the property. (Emphasis added.)

Therefore, pursuant to the Maryland Contract Lien Act and the Condominium Association By–Laws, the Maryland Rules govern the procedure by which a sale to foreclose a lien is commenced and executed. In accordance with the aforementioned Rules and statutory provisions, Respondents filed a Petition for Sale of Petitioner's condominium in the judicial sale case, and the presiding judge granted the Petition by executing a Decree for Sale of Premises, therein naming Diamond and Brown as trustees to conduct the sale.

With regard to proper application of the Maryland Rules to judicial sales, we stated in *Simard v. White,* 383 Md. 257, 310 n. 23, 859 A.2d 168, 199 n. 23 (2004):

Generally, Title 14, Chapter 200 of the Maryland Rules governs the foreclosure of lien instruments such as a foreclosure action pursuant to a power of sale or an assent to a decree provision contained within a mortgage or deed of trust. Title 14, Chapter 300, however, governs "all sales of property that are subject to ratification by a court," except as is otherwise specifically provided in Maryland Rules 2–644, 3–644 and Chapter 200 of Title 14. Therefore, Chapter 300 applies to foreclosure sales as much as is specifically provided for by Chapter 200 of the Maryland Rules.

Thus, there is an interplay between the provisions of Chapter 200 and Chapter 300 in Title 14 of the Maryland Rules such that Chapter 300 governs "all sales of property that are subject to ratification by a court," except where the relevant procedures are outlined in Chapter 200. In accordance with the Decree for Sale of Premises issued by the judge in the judicial sale case, the sale of Petitioner's condominium conducted by the trustees was subject to "obtaining the Court's

ratification of the sale[.]" Thus, Chapters 200 and 300 in Title 14 of the Maryland Rules controlled the procedures for the sale of Petitioner's condominium unit.

Of particular importance to the instant case, Maryland Rule 14–302(b) gives the court overseeing a judicial sale the power to appoint a trustee to make the sale. Maryland Rule 14–206 contains the requirements for procedures prior to a judicial sale, including provisions governing the duty of the person authorized to make the sale to file a bond and to give notice at the last known address of the debtor. Lastly, Maryland Rule 14–305 governs the procedures following a sale, including filing a report of the sale with the court, filing exceptions to the sale, and ratification of the sale by the court.

### C. Trustee Duties

Courts are vested with the authority to appoint trustees by decree to perform certain functions in connection with the judicial sale of property.[11] Md. Rule 14–302(b). Thus, the trustee's power in such a situation "emanate[s] from the court." *Goldberg v. Frick Elec. Co.*, 363 Md. 683, 693, 770 A.2d 182, 188 (2001) (quotation omitted). In this relationship between the court and the trustee, the court is the vendor and the trustee is an agent of the court. *Goldberg*, 363 Md. at 693, 770 A.2d at 187–88; *Talbert v. Seek*, 210 Md. 34, 43, 122 A.2d 469, 473 (1956); *Lurman v. Hubner*, 75 Md. 268, 273, 23 A. 646, 648 (1892). Therefore, the resulting judicial sale is a transaction between the court and the purchaser. *Columbia Paper Bag Co. of Balt. City v. Carr*, 116 Md. 541, 543–44, 82 A. 442, 443 (1911) (noting that judicial sales made by court-appointed trustees are "transactions between the Court and the purchasers, and as such, are regulated by all the principles of equity applicable to judicial sales" (citations omitted)); *Talbert*, 210 Md. at 43, 122 A.2d at 473. This Court has held that "[t]he bid of the purchaser, its acceptance, the report of

---

11. As noted, *supra*, Diamond and Brown were court-appointed trustees in the judicial sale of Petitioner's condominium. Accordingly, we focus our discussion on the role and responsibilities of court-appointed trustees.

the trustee, and its final ratification by the court, are all successive steps in the formation and completion of a perfect and binding contract of sale[.]" *Mizen v. Thomas*, 156 Md. 313, 322–23, 144 A. 479, 483 (1929). Thus, any dealings between the trustee and the third party purchaser are transactions that must be ratified by the court before they become binding. *Talbert*, 210 Md. at 43, 122 A.2d at 473 (holding that "until [a judicial] sale by a trustee is ratified by the court, it is an executory contract . . . an offer to purchase which has not been accepted" (quotations and citations omitted)); *Waters v. Prettyman*, 165 Md. 70, 75, 166 A. 431, 433 (1933) (holding that subsequent to a judicial sale, "the report of the sale must be made to and ratified by the court before a deed for the property is given by the trustee to the purchaser"). A ratification by the court signifies a finding that the sale was fairly made. *Waters*, 165 Md. at 75, 166 A. at 433.

A court-appointed trustee's duties have been described in the following way:

> [A trustee] has not by virtue of his office any title to the property decreed to be sold, or any interest in it, or in the proceeds of sale. He is not appointed to protect the rights of the different claimants to the money in his hands, or to represent them in any controversy. His functions are prescribed and limited by the decree which appointed him.

*Lurman*, 75 Md. at 274, 23 A. at 648. In general, a trustee is charged with acting in a diligent manner to perform the functions for which he or she was appointed. *See Standish Corp. v. Keane*, 220 Md. 1, 7, 150 A.2d 728, 731 (1959); *Talbert*, 210 Md. at 45, 122 A.2d at 474. Trustees have a duty to perform these functions without fraud or bad faith. *See Woelfel v. Tyng*, 221 Md. 539, 544, 158 A.2d 311, 313 (1960); *Standish Corp.*, 220 Md. at 9, 150 A.2d at 732; *Righter v. Clayton*, 173 Md. 138, 144, 194 A. 819, 821–22 (1937). This Court has summarized the fiduciary duty of a trustee by declaring: "A trustee is bound for the protection of the interest of all the parties concerned to bring the property into the market in such manner as to obtain a fair market price;

he must consider the best mode of offering the property, not only as to whether it was advisable to offer it in lots or parcels, but also to the proper location and outlines of each parcel." *Thomas v. Fewster,* 95 Md. 446, 449, 52 A. 750, 751 (1902) (citing *Carroll v. Hutton,* 88 Md. 676, 679, 41 A. 1081, 1082 (1898)). In *Simard v. White,* 383 Md. 257, 859 A.2d 168 (2004), we described in detail the fiduciary responsibilities of a trustee engaged in a judicial sale, stating that "[t]he trustee not only represents the holder of the note secured by the deed of trust, but also the owners of the property, who would be entitled to any surplus remaining after the payment of expenses and the note secured by the deed of trust." *Simard,* 383 Md. at 312, 859 A.2d at 201 (quotation omitted). In *Fagnani v. Fisher,* 418 Md. 371, 15 A.3d 282 (2011), we commented further on a trustee's duties, stating that a trustee has a duty "to exercise the same degree of prudence, care, diligence and judgment, that a man of ordinary business judgment and experience would exercise, in selling his own property." *Fagnani,* 418 Md. at 385, 15 A.3d at 290 (quoting *Webster v. Archer,* 176 Md. 245, 254, 4 A.2d 434, 438 (1939)).

 With regard to the judicial sale of property, trustees have certain duties in connection with the sale. In determining an adequate price for the sale, trustees have a duty "to make a thorough investigation of local conditions before they fix[ ] a price at which they [will] offer the property for sale." *Standish Corp.,* 220 Md. at 8, 150 A.2d at 732. This duty is not so rigid as to include "ferret[ing] out the exact state of ... liens [on the property], and ascertain[ing] how much, if any, may be due upon them." *Goldberg,* 363 Md. at 702, 770 A.2d at 193 (quotation omitted). Trustees have a duty to "offer the property in such manner as to bring its fair market value and to exercise the same judgment and prudence that a careful owner would exercise in the sale of his own property." *Gittings v. Morris,* 156 Md. 565, 577, 144 A. 836, 841 (1929) (citation omitted); *Fagnani,* 418 Md. at 385, 15 A.3d at 290. When trustees conduct the sale of the property, they have a duty to obtain as many offers as possible and to accept the best offer obtainable at the time of the sale.

*Standish Corp.*, 220 Md. at 9–10, 150 A.2d at 732; *Talbert*, 210 Md. at 45, 122 A.2d at 474; *Gilden v. Harris*, 197 Md. 32, 44–45, 78 A.2d 167, 172 (1951). Trustees must then report the offer to the court for ratification before the property is conveyed to the purchaser. *Waters*, 165 Md. at 75, 166 A. at 433; *Lurman*, 75 Md. at 273, 23 A. at 648. Trustees should not subsequently reopen the sale to receive additional bids on the property, even if it would result in a higher selling price. *Talbert*, 210 Md. at 45, 122 A.2d at 474 (asserting that "[o]nce having accepted a bid, the trustee should not reopen the sale merely to let in disappointed bidders" (citation omitted)); *Gilden*, 197 Md. at 42, 78 A.2d at 171.

 Subject to the review of the court, trustees perform various functions in connection with judicial sales for which they exercise personal discretion and judgment. In general, "trustees have 'discretion to outline the manner and terms of the sale[.]' " *Fagnani*, 418 Md. at 385, 15 A.3d at 290 (quoting *Simard*, 383 Md. at 312, 859 A.2d at 200). In *Jackson v. Townshend*, 249 Md. 8, 238 A.2d 81 (1968), we noted:

> Unless the precise method of sale is prescribed by contract or decree, some discretion is necessarily granted to the trustee ... making the sale, as to the manner in which the property will be offered. That discretion will naturally be affected by the character and location of the property and other circumstances peculiar to the case, so that it is impossible to lay down a hard and fast rule[.]

*Jackson*, 249 Md. at 16–17, 238 A.2d at 87 (quoting *Webster*, 176 Md. at 254–55, 4 A.2d at 438); *see Waters*, 165 Md. at 75, 166 A. at 432–33. For example, a trustee has the discretion to determine whether the property should be sold as a whole, or divided into separate parcels. *Webster*, 176 Md. at 254, 4 A.2d at 438; *Gittings*, 156 Md. at 577–78, 144 A. at 841; *see also Fagnani*, 418 Md. at 388, 15 A.3d at 292 (holding that "[a]s a matter of law, a trustee may foreclose on an undivided one half interest, rather than the entire property" (citation omitted)).

 Similarly, a trustee has discretion to exercise judgment with regard to the advertisement of property for sale, so long as the applicable statutory requirements are met.[12] A trustee has adequately advertised a property for sale if the "advertisement describe[s] the property so that it [can] be located by the exercise of ordinary intelligence and so that more detailed information concerning it [can] be obtained, if desired." *Woelfel,* 221 Md. at 543, 158 A.2d at 313 (quoting *deTamble v. Adkins,* 210 Md. 414, 420, 124 A.2d 276, 278 (1956)). It is well-settled that in such an advertisement, "complete accuracy is not required[.]" *Id.* A trustee should strive, however, not to include any misrepresentations or mis-descriptions about the property in the advertisement. *See Carozza v. Peacock Land Corp.,* 231 Md. 112, 120, 188 A.2d 917, 920–21 (1963) (holding that a purchaser will not be required to consummate a sale "if it would be inequitable to require him to do so, especially where there has been misrepresentation, intentional or otherwise, on the part of the trustee [in an advertisement]" (citations omitted)); *Columbia Paper Bag Co.,* 116 Md. at 552, 82 A. at 446 (holding that there has not been a mis-description of the property if the advertisement "accords substantially with the exact situation and condition").

 A trustee is also entitled to exercise personal judgment when determining the price to accept for the sale of the property. After conducting an investigation of the property and surrounding conditions, a trustee can exercise discretion in setting a fair price for which to offer the property for sale. *Standish Corp.,* 220 Md. at 8, 150 A.2d at 731–32 (discussing *Webb & Knapp, Inc. v. Hanover Bank,* 214 Md. 230, 133 A.2d 450 (1957)). While a trustee must sell the property to the highest bidder, the trustee has the discretion not to accept every bid offered. *See Gray v. Veirs,* 33 Md. 18,

---

12. Md. Rule 14-303(b) sets forth certain mandatory requirements for advertisements in public judicial sales, such as inclusion of "the time, place, and terms of sale in a newspaper of general circulation in each county where any portion of the property is located," along with a sufficient description of the property.

22 (1870) (noting that "the highest bidder must be understood [as] a person who makes the highest bid in good faith"). The trustee should, however, attempt to obtain as many bids as possible. *Gilden*, 197 Md. at 44–45, 78 A.2d at 172. The court will ordinarily ratify a sale made by a trustee "in the absence of fraud or improper dealing or a clear inadequacy of price *as of the time* the sale was made[.]" *Standish Corp.*, 220 Md. at 9, 150 A.2d at 732; *accord Gilden*, 197 Md. at 45, 78 A.2d at 172 (holding that "the court should, in the absence of fraud or improper dealing, or clear inadequacy of price as of the time the sale is made, or some valid legal objection, sustain the trustee and ratify the sale"); *Righter*, 173 Md. at 144, 194 A. at 821 (observing that the price obtained for the sale of property will not be considered inadequate "unless the price be so unreasonable as to indicate a lack of judgment and discretion, or misconduct, on the part of the trustee in making the sale"); *Kirkpatrick v. Lewis*, 159 Md. 68, 71, 149 A. 614, 615 (1930) (maintaining that a sale will be ratified in the absence of "any such gross inadequacy of price obtained as to indicate of itself an impropriety or defect in making the sale"). The highest bid obtained by a trustee will not later be deemed inadequate if the circumstances surrounding the sale were fair and "subsequent possibilities of obtaining a higher price" arise. *Gilden*, 197 Md. at 42, 78 A.2d at 171 (quotation omitted); *Talbert*, 210 Md. at 45–46, 122 A.2d at 474 (stating that "[t]he general rule is that if a trustee, acting diligently and without fraud, accepts an offer at [a] private sale for the most that he is able to obtain for the property *at the time,* and reports that offer to the court, it will not be set aside merely because someone else is *later* willing to give more for the property").

### D. Immunity

Immunity allows a defendant to "avoid[ ] liability in tort under all circumstances, within the limits of the immunity itself; it is conferred, not because of the particular facts, but because of the status or position of the favored defendant; and it does not deny the tort, but the resulting liability." William

L. Prosser, *Handbook of the Law of Torts* ch. 126, at 970 (4th ed. 1971). Within the broad concept of immunity, the Maryland Court of Appeals has distinguished between the doctrines of absolute judicial immunity and qualified public official immunity. *See Parker v. State,* 337 Md. 271, 284–85, 653 A.2d 436, 442 (1995) (noting that this Court has "distinguished between the qualified and narrower immunity for discretionary acts generally accorded to public officials, and absolute judicial immunity, which, unlike qualified immunity, applies regardless of the nature of the tort and even where the suit against the judge alleges that he acted in bad faith, maliciously or corruptly" (citations omitted)). While the parties, the trial court, and the intermediate appellate court in this case have focused on the concept of qualified judicial immunity, no such doctrine has been adopted by the Maryland Court of Appeals. *See Parker,* 337 Md. at 283, 653 A.2d at 442 (holding that "[t]he common law principle of *absolute judicial immunity* for judicial acts has neither been abrogated nor been modified in Maryland" (emphasis added)). The doctrines of absolute judicial immunity and qualified public official immunity, therefore, remain separate in Maryland. In discussing and analyzing the concept of qualified judicial immunity, the parties, the trial court, and the intermediate appellate court have conflated the doctrines of qualified public official immunity and absolute judicial immunity. Stressing the distinction between these doctrines, this Court has noted that "[a]n absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." *Smith v. Danielczyk,* 400 Md. 98, 121, 928 A.2d 795, 808–09 (2007) (quoting *Kennedy v. Cannon,* 229 Md. 92, 97, 182 A.2d 54, 57 (1962)). Thus, to fully answer the issues presented to this Court, we address both doctrines and their applicability to the circumstances of this case, holding that Respondents are entitled to receive neither qualified public official immunity nor absolute judicial immunity.

# 586

## Qualified Public Official Immunity

This Court has stated that "[a] governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice." *Livesay v. Balt. Cnty.*, 384 Md. 1, 12, 862 A.2d 33, 39 (2004) (citing *Lovelace v. Anderson*, 366 Md. 690, 714, 785 A.2d 726, 739 (2001)). Broken down into its component parts, in order to receive qualified public official immunity, an individual must, at the time of the alleged acts, be: (1) a public official; and (2) engaged in the performance of discretionary, rather than ministerial, acts conducted without malice. *See James v. Prince George's Cnty.*, 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980). Thus, in Maryland, "officials . . . enjoy no immunity at all for ministerial acts and only a qualified immunity on matters calling for the officer's discretion." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 132, at 1059 (5th ed. 1984). This qualified immunity for discretionary acts is destroyed "where the inferior officer does not act honestly and in good faith, but maliciously, or for an improper purpose." Prosser § 132, at 989; *see Mandel v. O'Hara*, 320 Md. 103, 111, 576 A.2d 766, 770 (1990) (concluding that "we can not [sic] think of any reason why a public official should not be held responsible for his malicious actions even though he claims they were done within the scope of his discretionary authority" (quoting *Robinson v. Bd. of Cnty. Comm'rs*, 262 Md. 342, 348, 278 A.2d 71, 74 (1971))); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 672–73, 541 A.2d 1303, 1308 (1988), *superceded by statute*, Md.Code (1984, 2004 Repl.Vol.), § 12–101(a) of the State Government Article, *as recognized in Houghton v. Forrest*, 412 Md. 578, 588–89, 989 A.2d 223, 229–30 (2010). In *Mandel*, this Court noted that the United States Supreme Court recognized two important rationales underlying the concept of public official immunity: "(1) the injustice of subjecting to liability an officer who is legally required to exercise discretion, particularly absent bad faith, and (2) the danger of deterring willing-

ness to exercise judgment with decisiveness posed by the threat of liability." *Mandel*, 320 Md. at 116–17, 576 A.2d at 772 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90, 99 (1974)); *see also James*, 288 Md. at 324, 418 A.2d at 1178 (noting that the rationale underlying the grant of public official immunity is "that a public purpose is served by protecting officials when they act in an exercise of their discretion" (quotation omitted)).

Importantly, this Court has maintained that "[o]ne is entitled to public official immunity only when he is acting as a public official rather than in some other capacity[.]" *Lovelace*, 366 Md. at 714, 785 A.2d at 739 (internal quotation omitted); Restatement (Second) of Torts § 895D cmt. g (observing that "immunity protects an officer only to the extent that he is acting in the general scope of his official authority"). A public official has been distinguished from an individual who is "a mere government employee or agent[.]" *Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 479, 805 A.2d 372, 391 (2002) (quotation omitted). In *James*, we discussed four factors that are useful in determining whether an individual is a public official:

(i) The position was created by law [13] and involves continuing and not occasional duties.

(ii) The holder performs an important public duty.

(iii) The position calls for the exercise of some portion of the sovereign power of the State.

(iv) The position has a definite term for which a commission is issued and a bond and an oath are required.

*James*, 288 Md. at 324, 418 A.2d at 1178 (citing *Duncan v. Koustenis*, 260 Md. 98, 105, 271 A.2d 547, 550 (1970)). We explained that these factors are not conclusive to our determination and that even if an individual does not meet these

---

**13.** A position created by law "means that: (a) the office was created by Constitutional or legislative enactment, such as a statute or local ordinance; (b) an oath is generally prescribed; and (c) a commission is issued." *de la Puente*, 386 Md. at 512, 873 A.2d at 370 (citing *Duncan*, 260 Md. at 108, 271 A.2d at 552).

criteria, he may nonetheless be considered a public official if he "exercises 'a large portion of the sovereign power of government' or 'can be called on to exercise police powers as a conservator of the peace.'" *de la Puente v. Cnty. Comm'rs of Frederick Cnty.*, 386 Md. 505, 512, 873 A.2d 366, 370 (2005) (quoting *Muthukumarana*, 370 Md. at 480, 805 A.2d at 391). As we stated in *de la Puente*, "[s]overeign power, in its simplest terms, means '[t]he power to make and enforce laws.'" *de la Puente*, 386 Md. at 513, 873 A.2d at 371 (quoting *Black's Law Dictionary* 1430 (8th ed. 2004)). The exercise of sovereign power, thus, "generally contemplates someone serving 'in a legislative or policymaking capacity.'" *Id.* (quoting *Duncan*, 260 Md. at 106, 271 A.2d at 551).

 Regarding the importance of determining whether an act is ministerial or discretionary, in *James* we stated that "this State's immunity doctrine depends upon the nature of the conduct of the agent being questioned." *James*, 288 Md. at 325, 418 A.2d at 1179. It has been aptly observed that because "most states afford a qualified, malice-destructible immunity for discretionary acts, but no immunity at all for 'ministerial' acts, the distinction between the two is critical[.]" Keeton § 132, at 1062. Courts have noted, however, that "in a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion." *James*, 288 Md. at 327, 418 A.2d at 1180 (quotation omitted); *see* Prosser § 132, at 990 (contemplating that "[i]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail" (quotation omitted)). Therefore, in analyzing the nature of a particular action, "a court should be careful not to let the mere fact that decisions are made in performing the questioned task be determinative of whether liability attaches to the conduct[.]" *James*, 288 Md. at 327, 418 A.2d at 1180.

 In a general sense, "ministerial ... refers to duties in respect to which nothing is left to discretion...."

*State, Use of Clark v. Ferling*, 220 Md. 109, 113, 151 A.2d 137, 139 (1959). An action has been defined as ministerial if "it is a duty that has been positively imposed by law, and its performance [is] required at a time and in a manner, or upon conditions which are specifically designated[.]" *First Nat'l Bank of Key West v. Filer*, 107 Fla. 526, 145 So. 204, 207 (1933). A function has also been described as ministerial if it is "absolute, certain, and imperative, involving merely the execution of a set task[.]" *James*, 288 Md. at 326, 418 A.2d at 1179 (quoting *Doeg v. Cook*, 126 Cal. 213, 58 P. 707, 708 (1899)). Similarly, a task is considered ministerial if it is "inflexibly mandatory." *McCray v. Maryland*, 456 F.2d 1, 4 (4th Cir.1972), *overruled in part by Pink v. Lester*, 52 F.3d 73, 77 (4th Cir.1995) (holding that the analysis by the court in *McCray* regarding liability for negligent conduct in an action brought pursuant to 42 U.S.C. § 1983 was inconsistent with United States Supreme Court case law). The Restatement (Second) of Torts provides useful commentary indicating that "[m]inisterial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done." Restatement (Second) of Torts § 895D cmt. h.

 Although the line between ministerial and discretionary acts can, at times, become blurred, the difference can be delineated more clearly by considering whether "the decision which involves an exercise of [the official's] personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized." *James*, 288 Md. at 327, 418 A.2d at 1180. In defining the distinction between discretionary and ministerial acts, Prosser has asserted that discretionary acts are those "requiring personal deliberation, decision and judgment," while ministerial acts are those "amounting only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own." Prosser § 132, at 988–89 (citation omitted). We explained in *Schneider v. Hawkins*, 179 Md. 21, 25, 16 A.2d 861, 864 (1940), that the term discretion "denotes freedom to

act according to one's judgment in the absence of a hard and fast rule ... according to the dictates of [one's] own ... conscience, and uncontrolled by the judgment or conscience of others."

Although Petitioner and Respondents base their various contentions on the conflated doctrine of qualified judicial immunity, several of their arguments are more appropriately discussed within our analysis of the doctrine of qualified public official immunity. Petitioner alleges in her Complaint that Respondents failed to comply with certain provisions of the Maryland Rules while performing functions in connection with the judicial sale. First, Petitioner claims that Respondents failed to give proper notice of the Petition for Sale in accordance with Maryland Rule 14–206(b)(2). The Rule in effect at the time of the judicial sale of Petitioner's condominium provided:

> Before making a sale of the property, the person authorized to make the sale shall send notice of the time, place, and terms of sale by certified mail and by first class mail to the *last known address* of ... the debtor[.] (Emphasis added.)

Md. Rule 14–206(b)(2). Petitioner alleges that although Diamond and Brown were aware that she was residing at a new location, they nevertheless directed notice of the Petition for Sale to the condominium address. Furthermore, Petitioner claims that Diamond and Brown filed a false or incorrect affidavit, in an attempt to comply with Maryland Rule 14–206(b)(5), stating that they had provided proper notice of the sale. The Rule in effect at the time of the sale provided, in relevant part:

> The person giving notice pursuant to subsections (b)(2), (b)(3), and (b)(4) of this Rule shall file in the proceedings an affidavit ... that the person has complied with the provisions of those subsections[.]

Md. Rule 14–206(b)(5). Petitioner alleges that Respondents did not comply with the mandatory notice provisions of subsection (b)(2) of the Rule. Thus, assuming the truth of those allegations, an affidavit stating that they had complied with

the notice provisions is false and in violation of subsection (b)(5) of the Rule.

Petitioner relies on this Court's opinion in *James* for her assertion that Respondents' actions of sending notice as required by Md. Rule 14–206(b)(2) and filing an affidavit as required by Md. Rule 14–206(b)(5), were ministerial acts and, thus, were not entitled to immunity. Petitioner claims that "[a] trustee's discretion over the manner and terms of [a] sale does not extend to the notice requirement of . . . Maryland Rule[ ] 14–206(b)(2). . . ." Petitioner cites the United States Supreme Court case of *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180, 188 (1983), to support her claim that "[t]here is nothing *discretionary* in the Trustees providing the 'minimum constitutional precondition' of actual notice to [Petitioner], as required by the Maryland Rules." Similarly, Petitioner maintains that Respondents should not be given protection for filing "a false Affidavit in contravention to the trustees' duties under the Rules of this Court[.]"

In contrast to Petitioner's claims, Respondents assert that their actions in connection with the sale were discretionary. Respondents state that although trustees are subject to the mandatory requirements of sending notice to the property owner and filing an affidavit confirming that appropriate notice was sent, "the method of providing notice, the steps to be employed, whether notice is to be issued by process server or mail, and a myriad of other factors, are all within the discretion of the trustee." Moreover, according to Respondents, their determination of Petitioner's correct last known address requires "a discretionary determination of what the Trustees knew[.]" Accordingly, Respondents claim that "[w]hat a trustee knows necessarily requires the exercise of discretion to determine what information and sources [he or] she should look to for such a determination."

While the parties focus their arguments on whether the actions performed by Respondents in connection with the judicial sale were ministerial or discretionary, our determina-

tion of the applicability of the qualified public official immunity doctrine hinges on whether Respondents were public officials at the time the acts were performed. Applying the definition of public official discussed, *supra*, we hold that Diamond and Brown, acting as court-appointed trustees, were clearly not public officials and, thus, the concept of qualified public official immunity is inapplicable to their actions in connection with the judicial sale of Petitioner's condominium. Because we hold that Diamond and Brown were not public officials at the time of the judicial sale and the surrounding actions that form the basis of Petitioner's Complaint, we do not reach the other elements of the test for qualified public official immunity.

Maryland cases discussing the role of a public official in the context of public official immunity consistently include a discussion of the public official's degree of control over the sovereign power of the state. *See, e.g., de la Puente,* 386 Md. at 513–14, 873 A.2d at 370–71; *Muthukumarana,* 370 Md. at 479–80, 805 A.2d at 391–92; *James,* 288 Md. at 324–25, 418 A.2d at 1178–79; *Duncan,* 260 Md. at 105–07, 271 A.2d at 550–51. In contrast to police officers, *Williams v. Mayor & City Council of Balt.,* 359 Md. 101, 138, 753 A.2d 41, 61 (2000), corrections officers, *Livesay,* 384 Md. at 12–13, 862 A.2d at 39, and prison guards, *Carder v. Steiner,* 225 Md. 271, 275, 170 A.2d 220, 222 (1961), individuals typically regarded as public officials in the context of discussing qualified public official immunity, Diamond and Brown do not possess the characteristics of a public official. Respondents were not acting as "governmental representative[s]" in performing functions in connection with the judicial sale of Petitioner's condominium. *See Livesay,* 384 Md. at 12, 862 A.2d at 39. Their actions before, during, and after the judicial sale of Petitioner's condominium were not related in any way to the exercise of the sovereign power of the state, as they did nothing "to make and enforce laws." *See de la Puente,* 386 Md. at 513, 873 A.2d at 371 (quoting *Black's Law Dictionary* 1430). Furthermore, the tasks performed by Diamond and Brown, including giving notice, filing papers with the court, and determining what actions to take in the judicial proceedings following the sale,

were clearly not performed in a "legislative or policymaking capacity." *See id.* (quoting *Duncan,* 260 Md. at 106, 271 A.2d at 551). Diamond and Brown were acting as court-appointed trustees, required to follow the instructions given to them in the Decree for Sale of Premises issued by the judge in the judicial sale case. Thus, the concept of qualified public official immunity is inapplicable to the circumstances of this case.

We also find it necessary to discuss the theory of "nesting" adopted by the Court of Special Appeals in this case.[14] Petitioner urges this Court in her Brief not to adopt the "nesting" approach followed by the intermediate appellate court, which essentially provides that Respondents are entitled to immunity for a "particular ministerial act necessary to carry out a broader discretionary authority vested by the court." *D'Aoust v. Diamond,* 197 Md.App. 195, 210–11, 13 A.3d 43, 52 (2010) (citing *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 435–36, 113 S.Ct. 2167, 2171, 124 L.Ed.2d 391, 399 (1993)). Although Respondents maintain that their actions in connection with the judicial sale were discretionary, they argue, in the alternative, that even if their actions are considered ministerial, this Court should adopt the nesting approach announced by the Court of Special Appeals. Respondents rely upon *Antoine*[15] and several cases from other jurisdictions[16] to

---

**14.** While the Court of Special Appeals addressed the concept of "nesting" in relation to the doctrine of judicial immunity, the foregoing discussion makes clear that our analysis of the validity of this concept in Maryland falls more appropriately within our discussion of qualified public official immunity.

**15.** We disagree with Respondents' interpretation of and reliance on the United States Supreme Court's analysis in *Antoine.* While Respondents maintain that *Antoine* supports the nesting principle utilized by the Court of Special Appeals in this case, it is clear that the Supreme Court's holding is inapplicable to this proposition. First and foremost, the Supreme Court in *Antoine* analyzed whether court reporters are entitled to absolute immunity, not a qualified immunity that would involve a discussion of the dichotomy between ministerial and discretionary acts. *Antoine,* 508 U.S. at 430, 113 S.Ct. at 2168, 124 L.Ed.2d at 396. The Supreme Court's holding reversed the United States Court of Appeals for the Ninth Circuit, which held that court reporters are absolutely immune because " 'the tasks performed by a court reporter

support the proposition that even if the acts of sending notice

in furtherance of her statutory duties are functionally part and parcel of the judicial process[.]' " *Antoine*, 508 U.S. at 432, 113 S.Ct. at 2169, 124 L.Ed.2d at 397 (quoting *Antoine v. Byers & Anderson, Inc.*, 950 F.2d 1471, 1476 (9th Cir.1991)). The Supreme Court repeatedly referenced an important distinction between those who exercise discretionary judgment and those who do not, distinguishing between the functions of a court reporter and a judge by noting that "[w]hereas court reporters are charged by statute with producing a 'verbatim' transcript of each session of the court ... common-law judges exercise discretion and judgment in deciding exactly what, and how much, they will write." *Antoine*, 508 U.S. at 434, 113 S.Ct. at 2170–71, 124 L.Ed.2d at 398. The Supreme Court also quoted its opinion in *Forrester v. White*, 484 U.S. 219, 228, 108 S.Ct. 538, 544, 98 L.Ed.2d 555, 565 (1988), stating that "some of the tasks performed by judges themselves, 'even though they may be essential to the very functioning of the courts, have not ... been regarded as judicial acts.' " *Antoine*, 508 U.S. at 437, 113 S.Ct. at 2172, 124 L.Ed.2d at 400. The Supreme Court summarized its holding by concluding that "[i]n short, court reporters do not exercise the kind of judgment that is protected by the doctrine of judicial immunity." *Id.*

16. In *Wilson v. Kelkhoff*, 86 F.3d 1438, 1442 (7th Cir.1996), the United States Court of Appeals for the Seventh Circuit addressed allegations that a corrections department employee and several members of a prisoner review board had violated a prisoner's due process rights by the manner in which they revoked his supervised release. The defendant claimed that the following acts by the board members violated his due process rights: failing to provide adequate notice of the hearing, failing to provide an opportunity to present evidence and witnesses, failing to adequately explain that the hearing was a final revocation hearing, and failing to provide adequate written notice of the reasons for revocation. *Wilson*, 86 F.3d at 1444. Relying on the Supreme Court's decision in *Antoine*, the defendant argued that the board members were not entitled to immunity for their non-discretionary acts. *Id.* The court, however, determined that the board members were entitled to absolute immunity because their actions were " 'part and parcel' of the [quasi-judicial] decision-making process." *Wilson*, 86 F.3d at 1445. The court quoted a prior decision on precisely the same matter stating: "The fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function." *Id.* (quoting *Thompson v. Duke*, 882 F.2d 1180,1184 (7th Cir.1989)). In *In re Castillo*, 297 F.3d 940, 944 (9th Cir.2002), the United States Court of Appeals for the Ninth Circuit reviewed the issue of whether a bankruptcy trustee was entitled to judicial immunity for allegedly mis-calendaring a hearing and failing to give the debtor proper notice of the hearing. The court held that the trustee was entitled to immunity because "the scheduling and giving of notice of hearings are part of the judicial function of managing the bankruptcy court's docket in the resolution of disputes," a function that is "unquestionably discretionary in nature." *Castillo*, 297 F.3d at 951.

and filing an affidavit with the court are ministerial in nature, they "are subsumed within the broader judicial function of the Trustees," thus entitling Respondents to receive the benefit of immunity. Therefore, in their alternative argument, Respondents focus the issue on whether the actions they performed are integral to the judicial process,[17] rather than on a discussion of whether the actions are discretionary or ministerial.

Notably, Respondents point to no Maryland Court of Appeals case that has expressly adopted the nesting approach utilized by the Court of Special Appeals in its analysis. To the contrary, this Court has consistently upheld the distinction between discretionary and ministerial acts in its application of the qualified public official immunity doctrine. *See, e.g., Parker v. State,* 337 Md. 271, 284, 653 A.2d 436, 442 (1995) (noting that "the Court has distinguished between the qualified and narrower immunity for *discretionary* acts generally accorded to public officials, and absolute judicial immunity, which ... applies [to judges] regardless of the nature of the tort" (emphasis added)); *Mandel,* 320 Md. at 110, 576 A.2d at 769 (recognizing that " 'the Maryland cases seem to indicate that *discretionary* action [of officials] will be protected only in the absence of malice' " (emphasis added) (quoting *Eliason v. Funk,* 233 Md. 351, 356, 196 A.2d 887, 890 (1964))); *Robinson v. Bd. of Cnty. Comm'rs,* 262 Md. 342, 346–47, 278 A.2d 71, 74 (1971) (holding that " '[i]n Maryland governmental immunity is extended to all non-malicious acts of public officials ... when acting in a *discretionary* ... capacity' " (emphasis added) (quoting *Duncan,* 260 Md. at 104, 271 A.2d at 550)).

In the context of public official immunity, we find no compelling reason to depart from Maryland precedent, which indicates that the distinction between discretionary and minis-

---

17. As noted, *supra,* the parties in this case have conflated the concepts of absolute judicial immunity and qualified public official immunity. Thus, although many of their contentions supposedly relate to the doctrine of judicial immunity, their assertions with respect to the dichotomy between ministerial and discretionary acts are more appropriately discussed within our analysis of the doctrine of qualified public official immunity.

terial acts is an important one. The clear purpose of such a distinction is to allow public officials the freedom to make discretionary decisions according to their best judgment, without undue influence from a fear of personal liability; this protection, however, is qualified in that officials will be subject to liability for actions performed with malicious intent. There is no similar need for protection when performing actions that are strictly mandatory and for which no discretion is involved. In these situations, public officials are appropriately held personally liable if their conduct is not in accordance with the applicable rules or instructions governing the functions they are performing. *See James,* 288 Md. at 328, 418 A.2d at 1180–81 (holding that the driver of an emergency vehicle is not entitled to receive qualified public official immunity because "the normal operation of a vehicle, including those on an emergency mission, is not ordinarily a discretionary act for which immunity will shield the driver from liability for negligence"). Because we consider this reasoning persuasive, we decline to adopt the nesting approach utilized by the Court of Special Appeals.

## Absolute Judicial Immunity

The concept of "absolute civil immunity for judicial acts" has long been a part of the common law. *Parker,* 337 Md. at 279–280, 653 A.2d at 440 (noting that "[b]y the seventeenth and eighteenth centuries, a broad concept of absolute civil immunity for judicial acts had been firmly established at common law" and that "American courts likely recognized the same broad principle of absolute judicial immunity from civil suits" (citations omitted)); *see also Bradley v. Fisher,* 80 U.S. 335, 347, 13 Wall. 335, 20 L.Ed. 646, 649 (1872) (stating that the doctrine of judicial immunity "has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country"). Thus, "judges always have been accorded complete immunity for their judicial acts within the jurisdiction of courts of justice, even when their conduct is corrupt, or malicious and intended to do injury." Prosser § 132, at 987 (citing *Bradley,*

80 U.S. at 347–48, 20 L.Ed. at 649–50); *Hiss v. State*, 24 Md. 556, 560–61 (1866) (holding that "[i]t is one of the most ancient, fundamental and cherished maxims of the common law, that a Judge should not be liable civilly or criminally, for error in judgment in the discharge of his office").

The purpose of affording this broad immunity is so that "a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself." *Parker*, 337 Md. at 281, 653 A.2d at 440 (quoting *Bradley*, 80 U.S. at 347, 20 L.Ed. at 649). Stated another way:

One purpose of this [absolute] immunity is to encourage independence and freedom of judges and legislators. It is thought unlikely that those officers will often commit abuses, because their acts are constantly submitted to public scrutiny and because the political process in the one case and the review process in the other are likely to prevent more serious torts. (Citations omitted.)

*Keeton* § 132, at 1059. Thus, in addition to "protecting the finality of judgments or discouraging inappropriate collateral attacks . . . judicial immunity also protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester v. White*, 484 U.S. 219, 225, 108 S.Ct. 538, 543, 98 L.Ed.2d 555, 564 (1988) (citation omitted). Importantly, those aggrieved by the decisions of a judge are not without recourse, as "well-developed, institutionalized mechanisms exist within the judicial system for correcting erroneous decisions made by judges." *Parker*, 337 Md. at 287, 653 A.2d at 443.

As discussed, *supra*, judges have long been afforded absolute judicial immunity. *Parker*, 337 Md. at 279, 653 A.2d at 440. In the interests of public policy, "[j]udicial immunity was [later] extended to officials other than judges because their judgments are functionally comparable to those of judges—that is, because they, too, exercise a discretionary judgment as a part of their function." *Gill v. Ripley*, 352 Md. 754, 762, 724 A.2d 88, 92 (1999) (internal quotations omitted).

Looking to United States Supreme Court precedent, we stated in *Gill* that "[t]he public policy notions articulated in *Bradley v. Fisher* with regard to judges . . . justif[y] an immunity for the judicial acts or omissions of [officials other than judges] as well." *Id.* Thus, the appropriate test for determining whether an individual is entitled to receive the benefit of absolute judicial immunity for certain functions is whether: (1) the act performed was by a judicial officer; and (2) the act was a judicial act.

With regard to the issue of determining whether an individual is a judicial officer, courts have focused mainly on the function performed by that individual. *See Forrester*, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565 (noting that "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches"). Courts have found guidance in considering the underlying purposes of the immunity shield, stating that "[t]he proper approach is to consider the precise function at issue, and to determine whether the officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct." *McCray v. Maryland*, 456 F.2d 1, 3 (4th Cir.1972); *see Forrester*, 484 U.S. at 224, 108 S.Ct. at 542, 98 L.Ed.2d at 563 (discussing the analysis of the immunity shield and noting that "we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions"). Similarly, it has been observed that affording immunity to individuals considered to be judicial officers serves the purpose for which the concept of judicial immunity was created, namely that individuals who are "necessary to the proper administration of justice" are given protection. *Gill*, 352 Md. at 762, 724 A.2d at 92 (holding that "the extension [of judicial immunity] to witnesses, attorneys, and parties . . . was regarded by us as necessary to the proper administration of justice"). The critical determination to be made in this respect is whether the individual is exercising judgment similar to that of a judge. *See id.; McCray*, 456

F.2d at 4 (noting that "a defense counsel, a court stenographer, and a jailer all have important duties in the judicial process, but none is afforded judicial immunity because none exercises judicial or quasi-judicial discretion which requires the protection of absolute judicial immunity" (internal citations omitted)).

This Court has indicated that judges are "granted immunity from liability for acts done by them in the exercise of their judicial functions[.]" *Parker*, 337 Md. at 280, 653 A.2d at 440 (internal quotation omitted); *Mandel*, 320 Md. at 107, 576 A.2d at 768 (holding that "absolute immunity protects . . . judges . . . so long as their acts are judicial . . . in nature" (internal quotation omitted)). A judge loses this absolute immunity only when he or she knowingly acts in the "clear absence of all jurisdiction" over the matter, *Parker*, 337 Md. at 282–83, 653 A.2d at 441 (quotation omitted), or when the act performed was not a judicial act. *See Mandel*, 320 Md. at 107, 576 A.2d at 768; Keeton § 132, at 1058. The determination of "[w]hether a function qualifies for absolute immunity is made objectively and not subjectively." *Mandel*, 320 Md. at 133, 576 A.2d at 780–81. The considerations relevant to determining whether an act by a judge is judicial "relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Parker*, 337 Md. at 290, 653 A.2d at 445 (quotation and citations omitted). For example, the issuance of a warrant has been considered a judicial act deserving of judicial immunity, *see Parker*, 337 Md. at 287, 653 A.2d at 444, while the demotion and discharge of court personnel has been treated as an administrative act not deserving of judicial immunity. *See Forrester*, 484 U.S. at 229, 108 S.Ct. at 545, 98 L.Ed.2d at 566. Applying a functional analysis to judicial officers other than judges, this Court has held that individuals such as law clerks and court clerks are entitled to judicial immunity "when performing tasks that are integral to the judicial process[.]" *Gill*, 352 Md. at 771, 724 A.2d at 96. Similarly, this Court has extended judicial immunity to witnesses, attorneys, and par-

ties because of the nature of the functions they perform in their involvement in the judicial process. *Gill,* 352 Md. at 761–62, 724 A.2d at 92.

Based upon the foregoing discussion of absolute judicial immunity as it has been defined and applied in Maryland, we reject the three-part test employed by the Court of Special Appeals in this case, as announced in *Rice v. Dunn,* 81 Md.App. 510, 568 A.2d 1125 (1990), and later applied in *Tucker v. Woolery,* 99 Md.App. 295, 637 A.2d 482 (1994). The test clearly conflates the doctrines of absolute judicial immunity and qualified public official immunity. To the extent that the analysis conducted by the Court of Special Appeals in those cases differs from the test outlined herein for determining whether to extend the benefit of absolute judicial immunity, we hold that such analysis is incorrect.[18] Thus, to emphasize our holding with regard to the appropriate test to be applied when determining whether an individual is entitled to receive absolute judicial immunity, courts should consider whether: (1) the act performed was by a judicial officer; and (2) the act was a judicial act.

Although the parties appear to concede that Respondents were judicial officers at the time of the judicial sale and the surrounding events, and thus fail to discuss this issue in their Briefs in any material way, our analysis of the issue of whether Respondents are entitled to absolute judicial immunity for their actions necessarily focuses upon a discussion of whether they were judicial officers at the time of the sale and the actions performed in connection therewith. In accordance with the applicable test for absolute judicial immunity, we hold that Diamond and Brown, acting as court-appointed trustees, were not judicial officers and, thus, are not entitled to receive the benefit of absolute judicial immunity for their actions in connection with the sale of Petitioner's condominium. Be-

---

**18.** Our critique of the analysis performed by the Court of Special Appeals in *Rice* and *Tucker* is limited to the court's endorsement of an incorrect test for determining the application of absolute judicial immunity; it does not reach other aspects of those opinions.

cause we hold that Diamond and Brown were not judicial officers, we need not, and do not, address the issue of whether their actions constituted judicial acts.

■ Our review of relevant Maryland case law leads us to conclude that court-appointed trustees are more analogous to guardians ad litem and receivers, individuals who are not considered judicial officers and who are, thus, not afforded judicial immunity. In *Fox v. Wills*, 390 Md. 620, 890 A.2d 726 (2006), we discussed the common law immunity of guardians ad litem appointed by the court. We noted that § 1–202 of the Family Law Article of the Maryland Code "is a short and succinct statute authorizing the court to 'appoint to represent the minor child counsel who may not represent any party to the action.'" *Fox*, 390 Md. at 633, 890 A.2d at 734. We determined from the language and history of § 1–202 of the Family Law Article that "[t]he only statutory function of [a guardian ad litem] is 'to represent the minor child.'" *Id.* With respect to the relationship between the guardian ad litem and the court, we maintained that a guardian ad litem has a duty to act for the benefit of the minor "and that the court's function is in overseeing the exercise of that duty." *Fox*, 390 Md. at 629, 890 A.2d at 731 (internal quotation omitted). Concluding that the functions of a guardian ad litem "are no more 'judicial' than the functions of many other trial attorneys," we held that "[i]t is clear that guardians, guardians ad litem, and non-judicial personnel appointed by courts for particular purposes, have no immunity from suit under the common law." *Fox*, 390 Md. at 634–35, 890 A.2d at 734. Importantly, and in support of our holding, we emphasized that "[w]hen the General Assembly has intended to grant immunity to court-appointed attorneys or advocates for children, it has done so expressly." *Fox*, 390 Md. at 636, 890 A.2d at 735 (citing Md.Code (1974, 2002 Repl.Vol.), § 3–830 of the Courts and Judicial Proceedings Article as an example).

In *Cnty. Corp. of Md. v. Semmes*, 169 Md. 501, 506, 182 A. 273, 275 (1936), we confronted the issue of liability of "receivers of a carrier of freight for hire in motor vehicles on

specified routes between *terminals on highways.*" The receivers in that case operated the utility at a loss and we addressed, *inter alia,* whether they were liable for the amount of that loss in operation. *Id.* In evaluating the actions of the receivers in *Semmes,* we stated that they "were the representatives of the court, and were without the authority or power to enter into a contract with reference to the corporate assets or management without the prior authorization or subsequent sanction of the court that had assumed jurisdiction of the property and administration of the affairs of the corporation." *Semmes,* 169 Md. at 513, 182 A. at 278. With regard to the potential liability of the receivers for their actions in connection with the operation of the utility, we held that "[w]hen a receiver acts as would an ordinarily prudent man in the management of his own affairs, he is not liable, but should he fail to exercise this degree of care and diligence, he will become answerable for losses to the property and assets in his charge in consequence of his neglect." *Semmes,* 169 Md. at 517, 182 A. at 280 (citations omitted). We noted that "[i]n respect to the duty of fiduciaries, the rule is firmly held that they are bound to keep clear, distinct, and accurate accounts so that they shall constantly know, or possess the means of knowing, the state of the administration of their trust." *Semmes,* 169 Md. at 521–22, 182 A. at 282 (citation omitted). Thus, the receivers should have known that they were operating at a loss and "they [were] charged with the consequences of an ignorance which arose from their grave neglect." *Semmes,* 169 Md. at 518, 182 A. at 280. Ultimately, we held that the receivers were personally liable for the loss they caused to the trust estate through their acts or omissions. *Semmes,* 169 Md. at 523–24, 182 A. at 283.

 Keeping in mind that the proper focus for this Court to maintain when determining whether an individual is a judicial officer is on the function performed by that individual, *see Forrester,* 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565, we find it useful to compare the functions of a trustee with those of a guardian ad litem and a receiver. As Petitioner stated in her Complaint, Diamond and Brown were trustees

appointed by the Circuit Court for Harford County to conduct a sale of a condominium for which Petitioner had defaulted on monthly assessment payments, and to act in accordance with the mandates of the applicable statutory provisions and Maryland Rules while performing their duties. Respondents' actions in connection with the sale, specifically giving notice prior to the sale, filing documents with the court, and communicating with the court after the sale, were all performed within the scope of their duties as trustees.

Similar to a guardian ad litem, a trustee appointed by the court has a duty to act diligently in the functions prescribed by the court. *See Standish Corp. v. Keane*, 220 Md. 1, 7, 150 A.2d 728, 731 (1959). In addition, trustees perform functions in a fiduciary capacity, akin to that of guardians ad litem, as they act in the execution of a judicial sale for "the protection of the interest of all the parties concerned[.]" *Thomas v. Fewster*, 95 Md. 446, 449, 52 A. 750, 751 (1902) (citing *Carroll v. Hutton*, 88 Md. 676, 679, 41 A. 1081, 1082 (1898)). Furthermore, just as the court must oversee the duties carried out by a guardian ad litem, *see Fox*, 390 Md. at 629, 890 A.2d at 731, so too must the actions of a trustee be reviewed and ratified by the court. *See Talbert v. Seek*, 210 Md. 34, 43, 122 A.2d 469, 473 (1956).[19] Of particular importance to our examination

---

**19.** In this regard, the position of a court-appointed trustee is similar to that of a court-appointed master. We stated in *State v. Wiegmann*, 350 Md. 585, 714 A.2d 841 (1998), that "[a] master is not a judicial officer, and the Maryland Constitution does not vest a master with any judicial powers." *Wiegmann*, 350 Md. at 593, 714 A.2d at 845 (citing *In re Anderson*, 272 Md. 85, 106, 321 A.2d 516, 527 (1974) (holding that "a master's findings do not become binding until approved by a judge of the court to which he reports")). We observed in *In re Marcus J.*, 405 Md. 221, 950 A.2d 787 (2008), that while a master is an officer of the court, this status "does not confer judicial powers upon the master, such as the authority to hold someone in contempt, to sign a warrant, or to order a police officer to make an arrest." *Marcus J.*, 405 Md. at 229, 950 A.2d at 791 (quoting *Wiegmann*, 350 Md. at 594, 714 A.2d at 845). Rather, "[t]he duties of the master are of an advisory character only. He decides nothing, but merely reports to the court...." *Wiegmann*, 350 Md. at 595, 714 A.2d at 845 (quoting *Nnoli v. Nnoli*, 101 Md.App. 243, 261 n. 5, 646 A.2d 1021, 1030 n. 5 (1994)). Thus, similar

of the potential liability of trustees is our holding in *Fox* that "non-judicial personnel appointed by courts for particular purposes, have no immunity from suit under the common law." *Fox*, 390 Md. at 635, 890 A.2d at 734 (citations omitted). Maryland Rule 14–302(b) provides that "[w]hen the court orders a sale it may appoint a trustee to make the sale. The trustee shall be a natural person." Thus, the Rule contemplates the appointment of a natural person by the court for a particular purpose, *i.e.*, to make a sale of property. In addition, just as we recognized with regard to the position of a guardian ad litem in *Fox*, the legislature has not granted statutory immunity to court-appointed trustees.

We have defined the position of a receiver as a "disinterested person appointed by a court, or by a corporation or other person, for the protection or collection of property that is the subject of diverse claims[.]" *Univ. Sys. of Md. v. Mooney*, 407 Md. 390, 411, 966 A.2d 418, 430 (2009) (quoting *Black's Law Dictionary* 1296 (8th ed. 2004)). In a similar vein, the trustees in this case were appointed by the court by decree to make a sale of property that was subject to a lien based upon a debt from unpaid condominium assessment fees. Just as receivers are representatives without authority to enter into binding contracts absent the consent of the court, *see Semmes*, 169 Md. at 513, 182 A. at 278, so too are trustees agents of the court who must seek ratification of their actions in connection with the judicial sale of property. *See Talbert*, 210 Md. at 43, 122 A.2d at 473. Additionally, trustees and receivers are both charged with exercising the same degree of care and diligence over the subject property as would be expected of an ordinarily prudent owner of that property. *See Semmes*, 169 Md. at 517, 182 A. at 280 (holding that a receiver is not liable when he "acts as would an ordinarily prudent man in the management of his own affairs"); *Gittings v. Morris*, 156 Md. 565, 577, 144 A. 836, 841 (1929) (holding that trustees have a duty to "exercise the same judgment and prudence that a careful

---

to a court-appointed trustee, a master's functions are subject to oversight and approval by a judge.

owner would exercise in the sale of his own property"). Thus, just as a receiver can be held liable for failing to exercise the requisite degree of care and diligence in the performance of his duties, it logically follows that a trustee can also be held liable for committing wrongful acts within the scope of his duties as prescribed by the court.

Importantly, and in accordance with our holding in his case, we stated in *Bauernschmidt v. Md. Trust Co.,* 89 Md. 507, 512, 43 A. 790, 791 (1899), that "[i]n no state are trustees, whether individuals or corporations, held to a stricter account than in Maryland." Although we concluded that there was insufficient evidence to prove that either the Trust Company or its officer were guilty of having made a false representation in *Bauernschmidt,* we noted that if "the defendant trustee violated the duties and obligations to which it had become subjected ... there [could] be no question of its responsibility." *Id.* Thus, it is apparent that this Court has held trustees liable for their tortious conduct, when adequately proven, in other contexts. Therefore, with regard to Respondents' actions, as alleged in Petitioner's Complaint, it was improper for the trial judge to grant Respondents' Motion to Dismiss, and for the Court of Special Appeals to affirm that grant, on grounds of immunity.

### E. Vicarious Liability

The final issue before us is that of the alleged vicarious liability of Rosen Hoover, P.A. for the actions of Diamond and Brown. Although the trial court and the Court of Special Appeals concluded that Rosen Hoover, P.A. was entitled to receive qualified judicial immunity based on the immunity given to Diamond and Brown, we disagree with that conclusion for a number of reasons. We hold, as a matter of law, that the principal in an agency relationship is not entitled to receive immunity simply because the agent is entitled to receive immunity;[20] the principal must establish an indepen-

---

[20]. We note that in the case before us, the agents, Diamond and Brown, are not entitled to receive immunity. We discuss the principles of

■

dent basis to receive the benefit of an immunity shield. We therefore hold that because Rosen Hoover, P.A. does not independently satisfy the tests for extending the benefit of absolute judicial immunity or qualified public official immunity, Rosen Hoover, P.A. is not entitled to immunity for the actions of Diamond and Brown in connection with the judicial sale of Petitioner's condominium.

■ With regard to the concept of immunity, as it relates to a cause of action based on vicarious liability, we stated in *James* that "[a]s a general rule ... the master remains liable for the servant's conduct even though the servant is himself not liable because of a personal immunity." *James v. Prince George's Cnty.*, 288 Md. 315, 332, 418 A.2d 1173, 1182 (1980) (citations omitted). Moreover, we opined that "the doctrine of *respondeat superior* should not ... permit a principal to assert the immunity of the agent in a suit founded on the agent['s] conduct." *Id.* In discussing public official immunity specifically, we held in *James* that "the government, when it has waived immunity ... is liable for torts committed by its officers even though those officers themselves are not liable because of public-official immunity." *James*, 288 Md. at 333, 418 A.2d at 1183 (citations omitted); *see Parker*, 337 Md. at 286, 653 A.2d at 443 (holding that "[t]he qualified immunity of a public official does not necessarily protect a government employer sued on a theory of *respondeat superior* "). Relying on the rationale in *James*, in *Lovelace v. Anderson*, 366 Md. 690, 705, 785 A.2d 726, 735 (2001), we stated:

> [U]nless the public official's governmental employer itself has immunity from an independent source, the public official's qualified immunity does not extend to the employer, and the employer can be held liable, under the doctrine of respondeat superior, for the official's negligence occurring in the scope of employment even though the official may be entitled to immunity. (Citations omitted.)

vicarious liability in conjunction with the concept of immunity, however, in order to respond to the holdings of the trial court and the intermediate appellate court as they relate to this issue.

Thus, unless there is an independent source of immunity for the employer or principal, a cause of action premised on vicarious liability can be brought even if the employee or agent is entitled to immunity. Although these cases dealt with individuals asserting entitlement to public official immunity, the agency principles stated therein are broad and apply to the concept of immunity generally as it relates to causes of action based on vicarious liability. Thus, we conclude that these agency principles are also applicable to cases where judicial immunity is asserted. We must, therefore, determine whether Rosen Hoover, P.A. has an independent basis for claiming a right to qualified public official immunity or absolute judicial immunity.

In accordance with the test for qualified public official immunity, outlined *supra*, we hold that Rosen Hoover, P.A. was not a public official at the time of the conduct alleged in Petitioner's Complaint because, similar to Diamond and Brown, it did nothing to exercise the sovereign power of the state in connection with the judicial sale of Petitioner's condominium. *See de la Puente v. Cnty. Comm'rs of Frederick Cnty.*, 386 Md. 505, 512–14, 873 A.2d 366, 370–71 (2005); *Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 479–80, 805 A.2d 372, 391–92 (2002); *James*, 288 Md. at 324–25, 418 A.2d at 1178–79. Therefore, Rosen Hoover, P.A. is not independently entitled to receive qualified public official immunity.

To receive absolute judicial immunity Rosen Hoover, P.A. must have been, at the time of the conduct alleged in Petitioner's Complaint, a judicial officer performing judicial acts. As we stated, a judicial officer is an individual or an entity performing functions that require the exercise of judgment similar to that employed by a judge. *See Antoine*, 508 U.S. at 436, 113 S.Ct. at 2171, 124 L.Ed.2d at 399; *Gill v. Ripley*, 352 Md. 754, 762, 724 A.2d 88, 92 (1999). Nowhere in the Decree for Sale of Premises, executed by the presiding judge in the judicial sale action, is Rosen Hoover, P.A. mentioned or given any role in connection with the sale or the actions surrounding the sale. Furthermore, there is no indication that Rosen Hoover, P.A. engaged in any activities in

connection with the sale such that it would be regarded as necessary to the proper administration of justice. *See Gill,* 352 Md. at 762, 724 A.2d at 92. Therefore, similar to Diamond and Brown, Rosen Hoover, P.A. was not acting as a judicial officer at the time of the events alleged in Petitioner's Complaint. Thus, we hold that Rosen Hoover, P.A. is not entitled to the benefit of absolute judicial immunity, and the Court of Special Appeals erred in affirming the trial court's ruling on this aspect of Respondents' Motion to Dismiss.[21]

We hold, therefore, that Diamond and Brown are not entitled to absolute judicial immunity or qualified public official immunity for their actions in connection with the judicial sale of Petitioner's condominium. Furthermore, we hold that Rosen Hoover, P.A. is not entitled to absolute judicial immunity or qualified public official immunity for any of the allegations in Petitioner's Complaint. Lastly, we hold that the Motion

---

21. Here, we stress that our holding is limited to the narrow issue of whether Rosen Hoover, P.A. is entitled to receive the benefit of qualified public official immunity or absolute judicial immunity for the allegations presented in Petitioner's Complaint. On remand, the liability of Rosen Hoover, P.A. will be contingent upon whether Petitioner can establish primary liability of Diamond and Brown and vicarious liability of Rosen Hoover, P.A. An employer can be found liable for the tortious acts of its employees if the employees, at the time of the tortious conduct, were acting within the scope of their employment and in furtherance of the employer's business. *See Oaks v. Connors,* 339 Md. 24, 30, 660 A.2d 423, 426 (1995) (holding that "[t]he doctrine of *respondeat superior,* in Maryland, allows an employer to be held vicariously liable for the tortious conduct of its employee when that employee was acting within the scope of the employment relationship" (citations omitted)); *Gallagher's Estate v. Battle,* 209 Md. 592, 602, 122 A.2d 93, 98 (1956) (emphasizing that "the doctrine [of respondeat superior] applies ... only when the relationship of master and servant existed in respect to the very thing from which the injury arose" (quotation omitted)). An employer can also be found liable for the tortious acts of its employees if the employer subsequently ratifies its employees' tortious conduct, even if that conduct was outside of the scope of employment. *See Adams' Express Co. v. Trego,* 35 Md. 47, 69 (1872) (concluding that "the act of the agent, though unauthorized at the time, may become binding upon the principal, by ratification and adoption" if it can be shown that "there was previous knowledge on the part of the principal of all the material facts and circumstances attending the act to be ratified" (citations omitted)).

filed by Respondents and granted by the trial judge is appropriately reviewed as a motion for summary judgment, not as a motion to dismiss; it was, therefore, improper for the trial court to grant, and for the Court of Special Appeals to affirm the grant of, Respondents' Motion, as Respondents were not entitled to immunity as a matter of law.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY.**

HARRELL, J., Dissents.

HARRELL, J., dissenting.

I dissent, for at least two reasons. Principally, I agree with the reasoning and result reached by the Court of Special Appeals, as explained in Judge Matricianni's reported opinion, *D'Aoust v. Diamond,* 197 Md.App. 195, 13 A.3d 43 (2010). Second, the Majority Opinion here raises the question (on the Court's initiative) and decides that qualified public official immunity also is unavailable as a defense by the trustees (or derivatively by their law firm), a question which the Majority opinion all but concedes was not briefed or argued by the parties below (or here) and certainly was not decided by either the trial court or our intermediate appellate court brethren. *See* Maj. op. at 563 n. 4, 36 A.3d at 949 n. 4 ("We note that the doctrine of qualified public official immunity was not specifically raised by Petitioner in her petition for writ of certiorari, nor was this doctrine discussed by the parties in their briefs to this Court. For purposes of clarifying the issues presented, however, we discuss and analyze the concepts of both absolute judicial immunity and qualified public official immunity .... "),

and 30–31 ("[T]he parties, the trial court, and the intermediate appellate court in this case have focused on the concept of qualified judicial immunity. . . ."). This is not the sort of instance where we should be deciding a question not presented by the parties, without giving them a chance to brief and argue the point decided.

I would affirm the judgment of the Court of Special Appeals.